UNITED STATES, Appellee,

v.

Wayman T. WHITE, Staff Sergeant,
U.S. Air Force, Appellant.

No. 97–0656.
Crim.App. No. S29207.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 4, 1998.

Decided Aug. 13, 1998.

For Appellant: *Captain W. Craig Mullen* (argued); *Major Ray T. Blank, Jr.* (on brief); *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Major Karen L. Manos,* USAFR (argued); *Colonel Brenda J. Hollis, Lieutenant Colonel Michael J. Breslin,* and *Captain Mitchel Neurock* (on brief).

*Opinion of the Court*

GIERKE, Judge:

A special court-martial composed of officer members convicted appellant, contrary to his pleas, of conspiring to wrongfully appropriate Air Force promotion-testing materials and violating a lawful general regulation by unlawfully obtaining access to and reviewing Air Force testing materials (2 specifications), in violation of Articles 81 and 92, Uniform Code of Military Justice, 10 USC §§ 881 and 892, respectively. The court-martial sentenced appellant to a bad-conduct discharge, a fine of $3000, confinement until the fine was paid but not to exceed 2 months, and reduction to pay grade E–4. The convening authority approved all of the adjudged sentence except the provision for enforcing the fine by confinement. The Court of Criminal Appeals affirmed these results in an unpublished opinion.

This Court granted review of the following issue:

WHETHER THE OVERWHELMING SELECTION OF COMMANDERS AS COURT MEMBERS AT KADENA AIR BASE, INCLUDING THE OVERWHELMING SELECTION OF COMMANDERS AT APPELLANT'S COURT–MARTIAL, TO THE EXCLUSION OF OTHER SERVICEMEMBERS WHO MEET THE CRITERIA SET FORTH UNDER ARTICLE 25, UCMJ, IS IMPERMISSIBLE AND, THEREFORE, SHOULD RESULT IN APPELLANT'S FINDINGS AND SENTENCE BEING SET ASIDE.

In addition, the Court specified the following issue:

WHETHER THE PRETEXT TELEPHONE CONVERSATION WHICH WAS DESIGNED AND ORCHESTRATED BY GOVERNMENT AGENTS TO OBTAIN INCRIMINATING STATEMENTS FROM APPELLANT RESULTED IN ADMISSIBLE EVIDENCE WHERE APPELLANT WAS NOT FIRST ADVISED OF HIS RIGHTS PURSUANT TO ARTICLE 31, UCMJ.

We now resolve these issues adversely to appellant.

*Court Packing*

## A. Facts

At trial appellant moved to dismiss the charges because of improper selection of the court-martial members. The factual basis for the motion was uncontested.

The record reflects that, in September 1995, approximately 3 months before selecting the members of appellant's court-martial, the convening authority sent a memorandum to his subordinate group and squadron commanders about the process for nominating court-martial members. He first announced that the duty of selecting court members in accordance with Article 25, UCMJ, 10 USC § 825, is "a duty I take seriously." Then he expressed concern about the process. He wrote:

> I recently had occasion to refer a case to trial by special court-martial. I noted that few commanders—indeed, none at all from certain groups—were identified as potential court members under our current system. During this most recent selection process, over 20% of the officers nominated by their groups to serve as court members were not available because of leave or TDY [temporary duty] commitments. Every group, with one exception, nominated at least two officers who simply were not there when the call came for this important duty. I've learned that in the past, officers who have PCSed [been permanently transferred to another duty station] or who have not even yet arrived have been nominated by their units for court duty.

He then issued the following guidance:

> The Air Force deserves a system composed of the very best officers we have to decide the issues in our courts. We as senior leadership need to set the example in justice matters. I expect you to nominate your best and brightest staff officers to serve as court members; and although I will make mission exceptions, I will regard all my commanders and their deputies as available to serve as members on any court-martial at Kadena. We have what's been hailed as the fairest legal system in the world; we need to pull together to make it work.

The following month the same convening authority sent a second memorandum to his subordinate commanders. He repeated his policy that "all my commanders, deputies, and first sergeants [are] available to serve as members on any court-martial at Kadena." He concluded with the following additional guidance:

> Each group is tasked on a quarterly basis to nominate staff officers and NCOs [noncommissioned officers] to serve as court members. I expect you to work closely with my legal office to ensure that the lists of personnel nominated to serve as court members are your best and brightest.

Defense counsel asserted that there were 737 officers at Kadena Air Base who were eligible for service on courts-martial, of whom 58 were commanders. The defense further asserted that commanders were only 7.8% of the officer population but constituted 80% of the membership of courts-martial.

There were 10 nominees to be members of appellant's court-martial. Eight of the nominees were serving in command positions. The convening authority selected 9 of the nominees, of whom 7 were commanders. The defense presented evidence that in 3 courts-martial appointed during the 6 months preceding appellant's court-martial, commanders constituted 6 of 9, 7 of 9, and 8 of 9 members.

The military judge denied the motion to dismiss. He explained his ruling as follows:

> Contrary to the holding in *[United States] v. Hilow* [32 MJ 439 (1991)], the facts here do not establish that the members were selected because they were supporters of a command policy of hard discipline.
>
> Indeed there is no evidence established that there is any command policy on discipline, let alone what that policy might be. Nor any connection between the members selected and such a possible policy. It's well established that court-martial panels are not required to be a cross-section between the military population. It is also well established that commanders have unique military experience which is conducive to selection as a court-martial member. The fact that there is a high percent-

age of commanders on a court, in and of itself, is not indicative of an improper selection process.

There is no evidence indicating that the members that were selected in this court-martial panel were selected to procure a particular outcome or a particular sentence. And, as I stated, therefore, the motion is denied.

## B. Discussion

Appellant now argues that the almost total exclusion of non-commanders violated Article 25. The Government argues that a preference for commanders does not invalidate the selection process, and that there is no evidence that the convening authority selected the members for an improper reason.

RCM 912(b)(1), Manual for Courts-Martial, United States (1995 ed.), provides that, when evidence is discovered that court members may have been selected improperly, a party may move to stay the proceedings. RCM 912(b)(2) authorizes the military judge to stay the proceedings until the members have been properly selected. RCM 912(b)(3) provides that improper selection is waived by failure to "make a timely motion under this subsection," unless the improper selection violates RCM 501(a), 502(a)(1), or 503(a)(2). Defense counsel did not request a stay under RCM 912(b)(1). However, because the Government does not assert waiver, we do not decide this case on that basis.

■ Article 25(d) requires a convening authority to select court-martial members who, "in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." A military accused is not entitled to have a representative cross-section of the community detailed to his or her court-martial. *United States v. Lewis,* 46 MJ 338, 341 (1997). On the other hand, members may not be selected solely on the basis of military grade. *United States v. Nixon,* 33 MJ 433 (CMA 1991). While it is permissible to look first at the senior grades for qualified court members, the lower eligible grades may not be systematically excluded. *United States v. Crawford,* 15 USCMA

31, 40, 35 CMR 3, 12 (1964); *see United States v. Daigle,* 1 MJ 139 (CMA 1975); *United States v. Greene,* 20 USCMA 232, 43 CMR 72 (1970).

■ Furthermore, a court-martial may not be "packed" to achieve a desired result. *Hilow,* 32 MJ at 440; *see United States v. Smith,* 27 MJ 242 (CMA 1988) (female members selected because case involved sex crime); *United States v. McClain,* 22 MJ 124 (CMA 1986) (systematic exclusion of junior officers and enlisted members in pay grade E–6 and below to avoid light sentences); *Daigle, supra* (lieutenants and warrant officers excluded); *see also United States v. Yager,* 7 MJ 171, 173 (CMA 1979) (permitted exclusion of soldiers in pay grades E–1 and E–2 as presumptively unqualified under Article 25(d)). Court packing may occur if a subordinate packs the list of nominees presented to the convening authority. *United States v. Hilow, supra.*

■ Court packing does not deprive the court-martial of jurisdiction, but it is a form of unlawful command influence. *Lewis,* 46 MJ at 341; *Hilow,* 32 MJ at 441. Thus, when an issue of court packing is raised, "we may not affirm unless we are convinced beyond a reasonable doubt that the court members were properly selected." *Lewis, supra.*

■ An element of unlawful court packing is improper motive. *See Lewis,* 46 MJ at 342 (no improper motive shown for disproportionate number of female members); *Crawford, supra* (opinion of Quinn, C.J.) (looking first to senior grades permissible where there was "no desire or intention to exclude any group or class on irrelevant, irrational, or prohibited grounds"). Thus, a convening authority "is free to require representativeness in his court-martial panels and to insist that no important segment of the military community—such as blacks, Hispanics, or women—be excluded from service on court-martial panels," so long as he or she does not systematically exclude a class or group of qualified candidates from court-martial membership. *Smith,* 27 MJ at 249.

■ Turning to the two memoranda sent by the convening authority to his group and

squadron commanders, we hold that they do not raise the issue of court packing. To the contrary, they reflect a commendable effort by the convening authority to ensure that the "best and brightest" members of his command serve as court members.

In his September 1995 memorandum, the convening authority expressed concern that commanders were being excluded from consideration by intermediate commanders. He also expressed concern that court-martial duty was apparently considered less important than other duties, and that nominations for duty were being made without consideration of the nominees' qualifications and availability.

In both his September and October memoranda, he made it clear that, but for certain mission exceptions, he considered all commanders available for court-martial duty, notwithstanding the demands and importance of command-related duties. Furthermore, in both memoranda he stressed that he wanted the lists of nominees to include not only commanders, but also "their deputies" and the "best and brightest staff officers." On its face, this guidance is inconsistent with appellant's claim that non-commanders were systematically excluded from consideration.

We turn next to appellant's argument that a disproportionate number of commanders were routinely selected as court-martial members. Court packing can occur when subordinates pack the list of nominees, even in the absence of improper motives on the part of the convening authority. Thus, we have examined the record to determine if there is evidence that those who compiled the list of nominees packed the list with commanders in an overzealous reaction to the convening authority's memoranda.

Like selection for promotion, selection for command is competitive. We agree with the observation of the then Army Court of Military Review (now Army Court of Criminal Appeals) that "officers selected for highly competitive command positions ... have been chosen on the 'best qualified' basis," and that the qualities required for exercising command "are totally compatible" with the statutory requirements for selection as a court member. *United States v. Carman,* 19 MJ 932, 936 (1985). Thus, selection of more commanders than non-commanders on a court-martial panel, absent evidence of improper motives or systematic exclusion of a class or group of eligible candidates, does not by itself raise an issue of court packing.

There are more lieutenants than colonels in the Air Force, but we do not require that lieutenants constitute the majority of court members selected. Similarly, we do not require that non-commanders constitute the majority of court members selected. There is no evidence in this case that commanders were selected for an improper purpose, and no evidence that the convening authority established or countenanced a selection process that excluded non-commanders from consideration for selection as court-martial members. Thus, we hold that appellant's statistical evidence showing that more commanders than non-commanders were detailed to courts-martial is not sufficient to raise the issue of court packing.

### Pretext Telephone Call

#### A. Facts

Mr. Harold Wilson was a Weighted Airman Promotion System (WAPS) test examiner at Kadena Air Base, Japan. He met appellant in April 1993, when appellant took the test. Thereafter, they saw each other from time to time in the base gymnasium and became acquainted. As the next scheduled testing approached, appellant expressed concern about passing the test. He told Mr. Wilson that the next test was his last chance to remain in the Air Force. In March or April 1994, Mr. Wilson offered to help appellant by letting him look at the WAPS test. Appellant accepted the offer. At first appellant compared the test to his study materials, but when this proved too slow, appellant brought a video camera to Mr. Wilson's office and videotaped the test material. Appellant scored much higher on his next test than he had previously. He was promoted to staff sergeant and later transferred to Reese Air Force Base, Texas.

Eventually, Mr. Wilson was caught compromising the controlled test material at

Kadena Air Base. He agreed to cooperate with the Air Force Office of Special Investigations (OSI) in return for a grant of immunity.

On March 30, 1995, the OSI asked Mr. Wilson to make a pretext telephone call to appellant. Appellant and Mr. Wilson had not spoken since appellant's transfer, and Mr. Wilson did not have appellant's telephone number or address. Mr. Wilson agreed to make the call. The OSI gave him appellant's telephone number and had him make the call from a commercial telephone line in the OSI office. The OSI told Mr. Wilson what information they wanted to elicit from appellant, and OSI agents listened to the conversation on an extension in an adjoining office.

Mr. Wilson described his conversation with appellant as follows:

Well, when I first called, he identified himself, and then I told him who I was. And I asked him, did you hear about what had happened here; in regards to the WAPS testing, me getting busted, so to speak? He said he heard something to that effect, but he wasn't very clear about what had happened, but he heard talk about it.

After that, I told him I was busted and that I wouldn't give him up. In other words, I wouldn't talk about what we had done. And after that he said I would appreciate it if I didn't give him up. And then I asked him, "Did he have any more of those tapes of the test that we had taken?" He said no, he had given me all the tapes back. And I asked him, "Did you tell anybody else about what we had done," he said no. I ended the conversation by saying, "Well, you know I'm not going to give you up," and he said he appreciated it. That was the end of the conversation.

Mr. Wilson described his conversation with appellant as "casual conversation." He testified that he did not recall if appellant asked where he was calling from.

Special Agent Bobo listened to the conversation on an extension telephone. He corroborated Mr. Wilson's description of the conversation. He testified that appellant did not ask where Mr. Wilson was calling from

and did not act like he suspected "a setup deal."

Appellant testified that the conversation was as follows:

He first asked, "Do you know who this is, and have you heard what happened," and I responded, "Vaguely." When I responded vaguely, I asked where were you calling from. And then he stated, "I am calling from my wife's office, because that's the only place I could afford to call from." Then Mr. Wilson asked me, "Did you make copies of the tape for anyone else," and I responded—

* * *

And I referred to Mr. Wilson, I did not make any copies or give any copies of the tape to anyone else.

* * *

He said, "Did you take any of the test booklets out of the office," and I said, "No sir, I did not, I never saw any test booklets."

* * *

Then he said, "Well, I was just calling you to keep in touch with you just to let you know what went on," and I told him, well good luck and hopefully nothing bad will happen to him, talk to you later, good bye.

Appellant also testified that he thought Mr. Wilson was calling him to question him and that the call was being recorded. No one from the OSI at Reese Air Force Base had contacted appellant before Mr. Wilson called him. Appellant told his first sergeant that he "had got a call from a guy that was a test proctor back at [his] old base, and he had been busted." In response to a question from the military judge, appellant testified that he felt free to end the conversation at any time.

At trial the defense moved to suppress the evidence of the telephone conversation on the ground that Mr. Wilson was acting as an interrogating agent for the OSI but failed to advise appellant of his rights as required by Article 31(b), UCMJ, 10 USC § 831(b). The

military judge denied the motion to suppress and made findings of fact and conclusions of law. He found that the substance of the telephone conversation was as Mr. Wilson described it. He concluded "that Mr. Wilson was acting in an official capacity in his inquiry pursuant to the request of the OSI," and "that the tenor and contents of the conversation indicate that it was a casual conversation; and therefore, the accused did not perceive that inquiry involved more than a casual conversation."

### B. Discussion

■ Before this Court, appellant contends that Article 31(b) warnings were required because Mr. Wilson questioned appellant as an agent of the OSI to obtain incriminating statements. The Government argues that Article 31(b) warnings were not required because the conversation was casual in nature. We hold that Article 31(b) warnings were not required.

Article 31(b) provides:

No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Mil.R.Evid. 305, Manual for Courts–Martial, United States (1995 ed.), implements Article 31(b). Mil.R.Evid. 305(b)(1) defines "person subject to the code" as including "a person acting as a knowing agent of a military unit or of a person subject to the code." Mil.R.Evid. 305(b)(2) defines "interrogation" as including "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning."

■ The warning requirement of Article 31(b) "applies only to situations in which, because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry." *United States v. Duga*, 10 MJ 206, 210 (CMA 1981); *see also United States v. Price*, 44 MJ 430, 432 (1996); *United States v. Harvey*, 37 MJ 140, 143–44 (CMA 1993). Thus, Article 31(b) warnings are required only if:

(1) a questioner subject to the Code was acting in an official capacity in his inquiry ...; and

(2) ... the person questioned perceived that the inquiry involved more than a casual conversation.

*Duga, supra* at 210.

■ When a military judge's ruling admitting evidence involves a mixed question of fact and law, as in this case, we review factfinding under a clearly erroneous standard and conclusions of law *de novo*. We will reverse if the findings of fact are clearly erroneous or the conclusions of law are influenced by an erroneous view of the law. *United States v. Sullivan*, 42 MJ 360, 363 (1995).

In this case the military judge correctly concluded that the first prong of *Duga* was met because Mr. Wilson was acting as an agent of the OSI and, thus, under Mil. R.Evid. 305(b)(1), was a person "subject to the code." He concluded that the second prong was not met, however, because appellant perceived the call to be a casual conversation. We agree with the military judge's conclusion regarding the second prong. The military judge resolved the factual conflicts between Mr. Wilson's and appellant's testimony by accepting Mr. Wilson's version. His findings are supported by the evidence and, thus, are not clearly erroneous.

Furthermore, even in appellant's version of the conversation with Mr. Wilson, appellant admitted that he felt free to terminate the conversation at any time. Appellant was not in custody and was at a distant military installation. He had not been contacted by the local OSI. In an apparently voluntary disclosure, he told his first sergeant about Mr. Wilson's call. Even if appellant was suspicious of Mr. Wilson's motive for calling him, all the evidence indicates that he still regarded Mr. Wilson as a casual acquaintance and a co-actor in compromising the

WAPS test. There is no evidence of coercion based on "military rank, duty, or other similar relationship." *Duga,* 10 MJ at 210. Thus, we hold that the military judge correctly applied the law to the facts.

### Decision

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judge CRAWFORD concur.

EFFRON, Judge (concurring in part and in the result):

I agree with the majority's resolution of Issue II and the disposition of this case but disagree with respect to the majority's analysis of Issue I, which concerns the selection of members to serve on appellant's court-martial panel. Because two distinct statutory provisions govern the selection of a court-martial panel, it is important to distinguish at the outset between the relevance in this case of unlawful command influence under Article 37, UCMJ, 10 USC § 837, and the *de facto* improper influence that results from deviating from the panel selection criteria under Article 25, UCMJ, 10 USC § 825.

Unlawful command influence under Article 37 involves improper influence by the command on the selection of the panel members or on their deliberations. *United States v. Hilow,* 32 MJ 439, 441 (CMA 1991). Structural processes have been built into the system to guard against the exercise of unlawful command influence and to provide public confidence in the military justice system.

There is no issue of unlawful command influence under Article 37 in this case. The record contains no evidence that the convening authority's preference for commanders was motivated by an improper purpose, such as an intent to affect the outcome of the court-martial. For example, appellant has not offered statistics in conjunction with other objective evidence that could circumstantially establish an improper motive, such as a history of acquittals or light sentences by non-commander panels. To the contrary, the evidence indicates that the convening author-

ity considered court-martial service to be an important duty and wanted the members of his command to view it as such.

Although non-commanders were underrepresented in a handful of courts-martial, I find no ill motive for the preference on the part of the convening authority. *See, e.g., Hilow, supra* (purposeful selection by deputy adjutant general of commanders and supporters of a command policy of hard discipline); *United States v. McClain,* 22 MJ 124, 130–31 (CMA 1986) (purposeful exclusion of ranks below E–7 with a view to heavier sentences).

With respect to Article 25, there is an ever-present potential for improper command influence in its implementation because the Article expressly grants to the convening authority the extraordinary and unusual power to select court-martial panels. Because the panel selection process in the military deviates significantly from the impartial selection process guaranteed in civilian trials by the Sixth Amendment, strict compliance with the formalities and constraints of Article 25 is a matter of critical importance to ensure that there is neither the actuality nor the appearance of improper influence.

As evidence of improper panel selection, appellant has pointed to the composition of 5 court-martial panels over a period of 6 months, along with the relative numbers of commanders and non-commanders at Kadena Air Base. While I do not rule out the possibility that a longer history of commander-dominated panels could establish that non-Article 25 criteria were considered in the selection process, I do not find that appellant's limited statistical showing raises the issue of "court packing" or supports a conclusion that this commander established or countenanced a process that had as its purpose or primary effect exclusion of non-commanders from consideration as court-martial panel members. *Cf. United States v. Loving,* 41 MJ 213, 286–87 (CMA 1994) (discussing deficiencies in appellant's statistical showing), *aff'd on other grounds,* 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996); *United States v. Lewis,* 46 MJ 338, 341–42 (1997).

In my view, in order to establish a violation of Article 25, appellant must present

either: (1) direct evidence of improper intent on the part of the convening authority to appoint commanders *qua* commanders as an improper shortcut application of the criteria under Article 25; or (2) a stronger statistical history of practice (*e.g.*, a greater number of courts-martial in a short period or a consistent practice over a longer period), from which an inference of such improper intent could be drawn and which would negate the inference drawn from the convening authority's memoranda that the high number of commanders was due to a pendulum effect (*i.e.*, over-correcting the shortage of commander-members on prior panels).

Two aspects of the majority opinion are of particular concern. First, I disagree with any suggestion by the majority that it would be permissible to equate command status and the Article 25 selection criteria. 48 MJ at 255. Because Article 25 is a unique exception to the Sixth Amendment right to an impartial jury, it must be strictly construed and applied. Although command experience may be an appropriate factor for consideration in determining whether a particular individual is "best qualified" to serve on a court-martial panel, it would be inappropriate to infer that, as a general matter, commanders as a class are "best qualified" to serve on court-martial panels simply because "selection for command is competitive." 48 MJ at 255. In that regard, I note that, even though promotion to grade E–7 is competitive, we held in *McClain* that the blanket exclusion of ranks below E–7 was impermissible under Article 25. The majority opinion seemingly would justify a preference for commanders based solely on their selection for command and command experience, without regard to the specific criteria of Article 25. I do not support such a deviation from the requirements of Article 25.

Second, I do not agree with the majority's suggestion that the convening authority's "guidance is inconsistent with appellant's claim that non-commanders were systematically excluded from consideration." 48 MJ at 255. On the contrary, the memoranda circulated by the convening authority indicated his concerns about court-martial panel service by commanders. It would not be surprising, in a military environment, for subordinates to implement that guidance in a manner that impermissibly excluded non-commanders. Although the statistical proof in this case is insufficient, that is different from suggesting that appellant's argument is inconsistent with the convening authority's guidance.

SULLIVAN, Judge (concurring in the result):

The Uniform Code of Military Justice does not permit the deliberate selection of commanders only as members of a court-martial. *See United States v. Greene*, 20 USCMA 232, 43 CMR 72 (1970). Article 25(d), UCMJ, 10 USC § 825(d), contrarily states:

(d)(1) When it can be avoided, no member of an armed force may be tried by a court-martial any member of which is junior to him in rank or grade.

(2) When convening a court-martial, the convening authority shall detail as members thereof *such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament.* No member of an armed force is eligible to serve as a member of a general or special court-martial when he is the accuser or a witness for the prosecution or has acted as investigating officer or as counsel in the same case.

(Emphasis added.)

This Court's acceptance of a "commanders only" selection practice, under the euphemism of "the best and brightest" members, 48 MJ at 255, sounds the death knell of our past judicial overwatch to make sure juries are properly selected in the military. *See generally United States v. McClain*, 22 MJ 124 (CMA 1986). This is an unlawful command-influence question under Article 37, UCMJ, 10 USC § 837, and it is an impermissible selection-criteria question under Article 25(d). *See United States v. Nixon*, 33 MJ 433, 434–35 (CMA 1991); *United States v. Hedges*, 11 USCMA 642, 644–46, 29 CMR 458, 460–62 (1960)(Latimer, J., concurring).

Nevertheless, I agree that affirmance of appellant's case is appropriate because the

factual record is insufficient to show such a practice in this case. In this regard, I rely on the decision of this Court in *Nixon, supra.* The convening authority in this case clearly articulated his understanding of Article 25(d) as allowing him to include his subordinate commanders as well as other eligible court members. His memorandum states:

MEMORANDUM FOR ALL GROUP AND SQUADRON COMMANDERS
FROM 18 WG/GC
Unit 5141, Box 10
APO AP 96368–5141
SUBJECT: Selection of Court–Martial Members

1. I regard the military justice system to be one of the key tools available to command to ensure the maintenance of good order and discipline. When a serious criminal offense is committed, the appropriate disposition of that offense is trial by court-martial.

2. The service of sharp, dedicated officers and NCOs as court members is essential if we are to have a fair and effective court-martial program. Article 25 of the Uniform Code of Military Justice tasks me with selecting those who "are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament" to serve as court members. This is a duty I take seriously.

3. The Air Force deserves a system composed of the very best people we have to decide the issues in our courts. We as senior leadership need to set the example in justice matters. *Although I will make mission exceptions, I regard all my commanders, deputies, and first sergeants as available to serve as members on any court-martial at Kadena.*

4. Each group is tasked on a quarterly basis to nominate staff officers and NCOs to serve as court members. I expect you to work closely with my legal office to ensure that the lists of personnel nominated to serve as court members are your best and brightest.

WILLIAM T. HOBBINS
Brigadier General, USAF
Commander, 18th Wing

(Emphasis added).

Although seven of nine members in this case were commanders, I see no commanders-only selection policy in the record of this case.

As for the second issue, I concur in the result reached by the majority. Unlike the situation presented in *United States v. Quillen,* 27 MJ 312 (CMA 1988), appellant was not questioned by a person in authority at the behest of the military. Accordingly, I agree Article 31, UCMJ, 10 USC § 831, is not applicable.