# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant ROBERT L. ATKINSON, JR.**
**United States Army, Appellant**

ARMY 20160634

Headquarters, 7th Infantry Division
Sean Mangan and Kenneth W. Shahan, Military Judges
Lieutenant Colonel James W. Nelson, Staff Judge Advocate (pretrial)
Colonel Russel N. Parson, Staff Judge Advocate (post-trial)

For Appellant: Lieutenant Colonel Tiffany M. Chapman, JA; Major Todd W. Simpson, JA; Captain Joshua B. Fix, JA (on brief).

For Appellee: Lieutenant Colonel Eric K. Stafford, JA; Major Hannah E. Kaufman, JA; Captain Jessika M. Newsome, JA (on brief).

2 October 2018

---------------------------------
MEMORANUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

SCHASBERGER, Judge:

At issue in this case is whether the composition of Sergeant Robert Atkinson's court-martial panel deprived him of a fair trial. Appellant alleges his conviction of one specification of rape of a child and one specification of sexual abuse of a child was the result of a biased panel. Specifically, that having members of the panel who participated in the Sexual Assault Review Board (SARB) at his installation created either actual or implied bias, and that one member of his panel misled the court during voir dire. Appellant also argues that the military judge erred by allowing in evidence statements made months after the alleged incidents as excited utterances.

We find no unlawful command influence in the form of court stacking. Further, we find that appellant's trial was free of bias. We agree with appellant that

the military judge erred in admitting the statements made seven months after the incident as excited utterances, but conclude appellant was not prejudiced by these admissions and therefore find no relief is warranted.

A panel with enlisted members sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of rape of a child and one specification of sexual abuse of a child in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b (2012) [UCMJ].[1]  The panel sentenced appellant to a dishonorable discharge, confinement for thirty-two years, and a reduction to the grade of E-1.  The convening authority approved the adjudged sentence.[2]

## BACKGROUND

Appellant was originally charged with sexually assaulting and threatening his five-year-old step-daughter, KF, and both physically assaulting and sexually assaulting his ex-wife, HA.  After arraignment but before trial, the government withdrew the charges involving HA.[3]  At the time of trial, only the charges relating to KF remained.

After general voir dire, both the government and the defense requested individual voir dire of all panel members.  The military judge granted the defense request.  The first individual questioned was Command Sergeant Major (CSM) KM.

The defense questioned CSM KM about his relationship with appellant.  Command Sergeant Major KM stated he did not recognize appellant but was "somewhat in his chain of command."  In describing the relationship, CSM KM stated the six Forward Support Companies (FSCs) under his battalion did not belong to his unit for administrative purposes.  The CSM stated, "I don't know the facts about this case—I didn't know anything about this case until—or any details about this case until what I just read a few minutes ago."  The military judge also questioned CSM KM about this relationship.  In response to the judge's questions, CSM KM clarified that his role is to place soldiers in the FSCs and can move them

---

[1] The panel acquitted appellant of two specifications of sexual assault and one of communicating a threat.

[2] Appellant also personally submits matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), which do not warrant discussion or relief.

[3] These charges are only relevant in that HA was considered a victim during the months preceding the trial and thus a potential SARB case.

2

from a FSC, but his battalion does not have operational or administrative control of the companies. All UCMJ actions went to another command team.[4]

During general voir dire, four members of the panel venire disclosed membership in the installation SARB and one member had previously participated in a SARB on another installation. The defense questioned each of these members on their understanding of the SARB and their participation. Though there was some disparity in the answers, the general understanding of the panel members was the purpose of the SARB was to ensure services for victims and to prevent future sexual assaults. Various panel members described the role of the commanding general at the SARB and the fact that brigade command teams participated in the SARB. No member recalled appellant's case from the SARB and each member stated they had no prior knowledge of the facts of appellant's case.

The defense made a blanket challenge of the four members of the panel who were installation SARB members[5] and an individual challenge against LTC M. After argument from both parties, the military judge granted the challenge against LTC M and denied the challenge of the SARB members. In his detailed findings,[6] the military judge concluded there was neither implied nor actual bias. As to the SARB, the military judge stated:

> Regarding the Sexual Assault Review Board it is not
> unusual for 4 out of 10 panel members to have experience
> on the SARB. Panel members are most often senior
> officers and enlisted members and it is the command
> teams within the Division or Corps that attend the SARB.
> The totality of the testimony today, while there were some

---

[4] The CSM noted that sometimes there would be confusion from outsiders as to who was responsible for the FSCs, so an initial police report would get directed to his unit. He would then redirect the report to the correct person.

[5] In addition to the blanket challenge to the four installation SARB members, defense also challenged CSM R because he had been on the SARB for eight months longer than the others. The defense argued this additional time was significant because the SARB used to have more information briefed on the cases. The practices of the Fort Lewis SARB were changed as a result of the case of *United States v. Elie*, ARMY 20160112, 2018 CCA LEXIS 17 (Army Ct. Crim. App. 16 Jan. 2018) (mem. op.). The military judge addressed the issues raised by CSM R in his findings of fact.

[6] The military judge's ruling on the challenge spanned five pages of transcript, including a discussion of the voir dire answers of each of the challenged members.

3

> minor variations, made it clear that the purpose of the SARB is to ensure services for alleged victims are proceeding appropriately and to discuss preventative measures the commands may take such as changing door codes and conducting roaming patrols during high risk hours at night . . .

> The court notes that all four panel members made it clear that names of the subjects or the accused service members at a court-martial are not used at the SARB and that the briefings from the command teams are intentionally presented as generically as possible so as not to taint any court-martial proceeding.

After ruling on the challenges for cause, the military judge asked for peremptory challenges. The government counsel challenged LTC C. The judge then asked the defense if they had any peremptory challenge; instead of immediately responding, the defense requested a short break. After the defense team consulted, the defense counsel stated, "No peremptory challenge from the defense." After the challenges, two lieutenant colonels, one major, and five sergeants major formed the panel.

The government called LA as the first witness. LA began seeing KF's mother, HA, during the time HA and appellant were married. He then married HA after her divorce from appellant. LA was a stay-at-home father and the primary caretaker of KF and her siblings.

LA testified that one day after putting the kids down for naps, he heard noise in KF's room.[7] He went to tell her to go to sleep and when he opened the door, he saw her with her hands by her crotch and her shorts and underwear at her ankles. Surprised, he asked what she was doing and she replied that she was bored. LA asked her again and she said she was pretending to give birth and "had her fingers in her monkey." LA asked where she learned this from and she said "Robert."

LA continued to testify as to KF's answers to his questions. He described KF as crying and scared. LA testified that KF told him, "I can't tell you or he'll kill me" and "when she's at Robert's house she would get told to go into his bedroom, get undressed, go suck on his peepee until white stuff came out, and then she'd be told to go spit that out." While this discussion was going on, HA came home for lunch, so LA went outside to tell her what happened and then they went back inside the house to talk to KF.

---

[7] At the time of this incident, KF was seven years old.

Eventually, defense objected to this line of questioning as hearsay. The government's position was that it was an excited utterance. The military judge sustained the objection stating, "I don't have enough information as to excited utterance." The government then laid a foundation as to KF's emotional state, her physical state, and how long it had been since she was caught. After eliciting testimony regarding KF's crying, stuttering, and that about 30 minutes had elapsed since the initial conversation in the bedroom, the military judge allowed the government to ask LA questions about the conversation between KF, HA, and him. After the objection was overruled, LA testified that KF said she accidentally bit Robert and he yelled at her. When trial counsel asked, "Did [KF] ever say why she didn't say no," LA replied, "At that point Robert was her dad, and she said, 'He told me to, and he seemed to like it.'"

KF testified by remote live testimony.[8] She testified that Robert had her "suck on his private part, and go up and down." She described touching his "round thingies" and that his private part looked like a "big stick." Further, she testified that he would put "gooey stuff" in her mouth and have her hold it there and then spit it out. KF also described the sounds Robert would make if she accidentally bit him.[9]

On cross-examination, defense elicited the fact that KF prepared for trial with the government but never spoke to the defense. Defense also elicited that KF never told LA she was pretending to have a baby, and some other inconsistencies with the testimony of HA and LA.

The government called two special agents who interviewed appellant regarding the allegations. They testified that appellant denied the allegations. However, appellant admitted that one time KF walked in when he was masturbating and watching pornography and saw his genitalia, and that maybe when he was very drunk she touched his penis.

---

[8] Prior to trial, KF's special victim counsel (SVC) moved to allow KF to testify via remote live testimony. After taking evidence on the issue, the military judge granted the SVC's request. KF testified from another room in the building using two-way video conferencing. She was visible to the military judge, defense, and panel members. Present in the room with KF was a defense counsel, two trial counsel, KF's special victim representative, expert consultants for both defense and the government, and one paralegal.

[9] KF also testified that Robert would have her "sit" on his private part and go up and down, that it hurt, and that he "would show me videos of a girl and a man doing it."

**LAW AND DISCUSSION**

*1. Was appellant's court-martial panel biased?*

Appellant alleges that he was denied a fair trial or the appearance of a fair trial when four members of the panel venire and three members of the panel who convicted him were members of the SARB. For the first time on appeal, appellant argues that the high percentage of SARB members is evidence that there was unlawful command influence in the selection of the panel. We disagree with appellant that any specter of UCI was raised and instead believe the proper framework to review the panel composition was the one raised at trial, that is a test for actual and implied bias.[10]

We review the selection of panel members for error de novo. *United States v. Bartlett*, 66 M.J. 426, 427 (C.A.A.F. 2008). A convening authority may select anyone in his command as long as he applies the criteria set out in Article 25, UCMJ. Specifically, he "shall detail as members . . . as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25(d)(2), UCMJ. The Convening Authority may not attempt to stack the court to achieve a specific result, whether that is to secure a conviction or to achieve a harsher sentence. *See, e.g., United States v. Riesbeck*, 77 M.J. 154 (C.A.A.F. 2018); *United States v. McClain*, 22 M.J. 124 (C.M.A. 1986). Where selection of panel members on an impermissible basis is raised by the evidence, the government needs to present affirmative evidence of benign intent beyond a reasonable doubt. *Riesbeck*, 77 M.J. at 159 (citations omitted).

Appellant argues that his case is akin to *Riesbeck*. In *Riesbeck*, the seven member panel was composed of five women, four of whom were victim advocates (i.e. individuals who receive training to provide support and counseling to victims of

---

[10] By claiming the issue is one of improper member selection and unlawful command influence, appellant is able to skirt the issue of waiver. *See United States v. Riesbeck*, 74 M.J. 176, 176 (C.A.A.F. 2014) (citing *United States v. Baldwin*, 54 M.J. 308, 310 n.2 (C.A.A.F. 2001)). On the other hand, when counsel unsuccessfully challenge a member for cause, "failure by the challenging party to exercise a peremptory challenge against any member shall constitute waiver of further consideration of the challenge upon later review." Rule for Courts-Martial (R.C.M.) 912(f)(4). Because appellant did not use his peremptory challenge to remove any of the three remaining SARB members, he waived that issue. As defense counsel stated in his affidavit, he played the numbers game, but wanting to have eight members on the panel does not change the waiver into a preserved issue. *See, e.g., United States v. Kelly*, 76 M.J. 793, 796 (Army Ct. Crim. App. 2017), *rev'd on other grounds*, 77 M.J. 404 (C.A.A.F. 2018).

rape and sexual assault). The Court of Appeals for the Armed Forces (CAAF) concluded the convening authority used gender as an improper basis to get the result of a "large number" of women on the panel. *Id.* at 165.[11]

We do not find *Riesbeck* on point, as the facts in appellant's case are clearly distinguishable. First, the convening authority did not select members based on gender. The four members in question were men – the same gender as five out of six of the unchallenged members and the same gender as appellant. Second, membership in the SARB is based on position and not based on special training in assisting victims. Third, there is no evidence that the convening authority used anything other than Article 25 criteria in his selection.

The individuals participated in the SARB because they were part of a battalion or brigade command team. Battalion and brigade leadership positions are very competitive; as our superior court has found, "officers selected for highly competitive command positions . . . have been chosen on the best qualified basis, and that the qualities required for exercising command are totally compatible with the statutory requirements for selection as a court member." *United States v. White* 48 M.J. 251, 255 (C.A.A.F. 1998) (citation and internal quotation marks omitted). Given the requirement that all installation senior commanders and senior command sergeants major participated in the SARB, and that the qualities which lead soldiers to be selected for leadership positions are akin to those in Article 25, we do not find evidence that the convening authority stacked the panel.

We next look to see if the panel was biased. At trial, appellant challenged four members of the panel for actual and implied bias, based on their membership in the SARB.

Actual bias is a question of fact to be decided by the trial judge on the basis of the responses of the member and any other evidence presented. "A military judge's ruling on a challenge for cause is reviewed for an abuse of discretion. Military judges are afforded a high degree of deference on rulings involving actual bias. This reflects, among other things, the importance of demeanor in evaluating the credibility of a member's answers during voir dire." *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015) (quoting *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002)). In *United States v. Daulton*, our superior court made clear that the burden of establishing grounds to support a challenge for cause is on the party making the challenge. 45 M.J. 212, 217 (C.A.A.F. 1996) (citing R.C.M. 912(f)(3)).

---

[11] The court based its decision on the fact that the panel members were women and not that they were victim advocates. Specifically, CAAF stated "we are convinced that the member selection in this case was based in no small part on gender, which is error." *Riesbeck*, 77 M.J. at 162 (citations omitted).

In light of this standard, there is no basis for us to disturb the trial judge's finding that the four panel members exhibited no actual bias. The defense, government, and the military judge questioned the panel members and did not elicit any responses that would suggest they had prior knowledge of appellant's case or that their participation in the SARB predisposed them to have a bias against appellant. We conclude the trial judge did not abuse his discretion in denying the challenges for cause on actual bias grounds.

The test for implied bias is objective, viewing the circumstances through the eyes of the public and focusing on the perception or appearance of fairness. *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (citations omitted). "We look to determine whether there is 'too high a risk that the public will perceive' that the accused received less than a court composed of fair, impartial, equal members." *United States v. Moreno*, 63 M.J. 129, 134 (C.A.A.F. 2006) (quoting *United States v. Wiesen*, 56 M.J. 172, 176 (C.A.A.F. 2001)).

The standard for reviewing rulings on challenges involving implied bias is "less deferential than abuse of discretion, but more deferential than de novo review." *Moreno*, 63 M.J. at 134 (citations omitted). Where a military judge has addressed implied bias by applying the liberal grant mandate on the record, that military judge will accordingly be granted "more deference on review than one that does not." *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007).

We also conclude the trial judge did not err in refusing to grant the implied bias challenge against these members. The trial judge clearly articulated his consideration of the liberal grant mandate in his rejection of the challenge on both actual and implied bias grounds. Thus, we grant more deference to his decision than we would if he had failed to articulate his consideration of this principle.

The purpose of the SARB is to ensure a victim is provided services and to prevent sexual assaults. The cases are briefed without identifying information. The challenged members established their willingness to follow the instructions of the military judge. The military judge found the four panel members to be open, forthright, and answered all the voir dire questions honestly with no attempt to evade.

After reviewing the totality of the circumstances of this case, we find a reasonable member of the public, sitting in the courtroom and hearing the members' responses, would not harbor a substantial doubt as to the fairness of appellant's court-martial. Thus, we conclude the military judge did not err in his denial of the implied bias challenges.

Finally, the defense has asked for a *DuBay* hearing to determine whether SARB membership was considered as a criterion for panel selection.[12] *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). We find that a *DuBay* hearing is not warranted in this case.

Appellant's final challenge to his panel was that a panel member, CSM KM, gave misleading answers, and but for his answers the defense counsel would have challenged CSM KM. We find that neither the evidence in the record nor the evidence provided on appeal demonstrates that CSM KM misled the court with his answers.

An accused is entitled to honest answers in voir dire. "Voir dire is a critical tool for ensuring that the accused is tried by an impartial trier of fact—the touchstone of a fair trial." *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017) (citation and internal quotation marks omitted). "The effectiveness of voir dire depends upon each potential member's providing valid, relevant information so that both judge and counsel can evaluate the member's qualifications and suitability for court-martial service." *United States v. Mack*, 41 M.J. 51, 54 (C.M.A. 1994). In *Mack*, the CAAF adopted a two-pronged test for determining if a new trial is required when an error arises from a juror's failure to disclose information in voir dire. 41 M.J. at 55. First, one must show the panel member failed to answer honestly a material question on voir dire; second, that a correct response would have provided a valid basis for a challenge for cause. *Id*.

Appellant cannot meet the first prong of this test. At trial, CSM KM explained the relationship of his position to that of appellant. He was the battalion command sergeant major of 296th Brigade Support Battalion (BSB), and his battalion had six companies which fell under his battalion for Modification Table of Organization and Equipment (MTOE) purposes but not for operational or administrative control. CSM KM further explained that UCMJ actions were handled by another command team, but that sometimes reports would come to his unit as there could be confusion as to who was responsible for a soldier. When that happened, CSM KM stated he would pass on the information to the correct unit.

On appeal, appellant submitted an affidavit from his civilian defense counsel which notes that the 296th BSB commander, LTC Z, and CSM KM worked together

---

[12] Appellant also argues the *DuBay* hearing would determine whether SARB members made any materially inaccurate statements about the content of the SARB and whether the totality of the circumstances deprived appellant of a fair trial or the appearance of a fair trial. As there is no evidence to believe that the SARB members made inaccurate statements, we decline to order what appears to amount to a fishing expedition. We do not believe that appellant meets the standard to order a *DuBay* set forth in *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

for years, that their unit Facebook page showed many pictures of the two together at unit events, and that LTC Z must have known a lot about the trial as he received at least two Law Enforcement Serious Incident Reports (SIRs). The defense counsel states that "he finds it impossible to believe that LTC [Z] and CSM [KM] never discussed the case" and "it is highly likely that CSM [KM] was briefed on the case . . ."

We do not read defense counsel's affidavit as contradicting the answers CSM KM gave at trial. Further, applying the test outlined in *United States v. Sonego*, 61 M.J. 1, 4 (C.A.A.F. 2005), we do not believe a *DuBay* hearing is necessary. Before such a hearing is ordered, the defense must make at least a "colorable claim" of juror dishonesty and defense counsel's affidavit does not meet this criteria. *Sonego*, 61 M.J. at 4.

### 2. *Improper Use of Excited Utterance Exception to Hearsay*

Appellant argues that the military judge erred by allowing the government to introduce statements of the victim to her step-father as an excited utterance. For the reasons we state below, we agree with appellant but find that there was no prejudice to appellant.[13]

A military judge's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010). A military judge abuses his discretion when he or she is incorrect about the applicable law or improperly applies the law. *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004). The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015) (citation omitted). A military judge's factfinding is reviewed under the clearly erroneous standard of review, while conclusions of law are reviewed de novo. *White*, 69 M.J. at 239 (citation omitted).

As the military judge admitted KF's statement to LA under Military Rule of Evidence (Mil. R. Evid.) 803(2), we review his decision in light of the military judge's application of the three-part test for admission of such evidence: "(1) the

---

[13] At a minimum, any objection to KF's statements made prior to the defense objection is forfeited. *See United States v. Lopez*, 76 M.J. 151, 154 (C.A.A.F. 2017). Appellant thus "has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *Id.* (citation omitted). "[F]ailure to establish any one of the prongs is fatal to a plain error claim." *Id.* (citation omitted). We conclude, at the very least, appellant cannot establish material prejudice to his substantial rights, which requires showing a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.* (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016)).

statement must be 'spontaneous, excited or impulsive rather than the product of reflection and deliberation'; (2) the event prompting the utterance must be 'startling'; and (3) the declarant must be 'under the stress of excitement caused by the event.'" *United States v. Bowen*, 76 M.J. 83, 88 (C.A.A.F. 2017) (quoting *United States v. Arnold*, 25 M.J. 129, 132 (C.M.A. 1987)).

The idea behind this exception is that a person who reacts to a startling event or condition "while under the stress of excitement caused thereby will speak truthfully because of a lack of opportunity to fabricate." *United States v. Jones*, 30 M.J. 127, 129 (C.M.A. 1990) (internal quotation marks omitted). There is therefore a strong presumption against admitting statements under Mil. R. Evid. 803(2) when the statement is not made immediately after the startling event. *Id.* at 129. There is not a specific period of time delineated; instead, "[t]he critical determination is whether the declarant was under the stress or excitement caused by the startling event." *United States v. Feltham*, 58 M.J. 470, 475 (C.A.A.F. 2003); *See also United States v. Donaldson*, 58 M.J. 477, 482-84 (C.A.A.F. 2003).

In this case, KF made the statements at issue while crying and in what the military judge concluded was an excited condition. Though there was a delay of 30 minutes while LA consulted with HA, KF was still excited. The error of the military judge was determining that the startling event which caused KF to be excited was getting caught masturbating in a way not appropriate for a seven-year-old child. The statements, however, related to a different startling event, that of being molested at least seven months prior.

The plain language of the rule, i.e. that the statement relates to a startling event and the declarant makes the statement while under the stress of excitement caused by the event, requires a linkage between the statement made and the cause. The necessity of the linkage has also been established in case law. In *Jones*, the Court of Military Appeals found no excited utterance when a crying witness was asked what was wrong. 30 M.J. at 128-30. Though the statement was clearly made while excited, the cause of the crying was too removed from the moment to be an excited utterance. *Id.* at 129-30.[14]

As we find the military judge abused his discretion in admitting KF's statement as an excited utterance, we review the prejudicial effect of that ruling de novo. Prejudice from an erroneous evidentiary ruling is evaluated by weighing: "(1) the strength of the government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in

---

[14] In reaching this conclusion, we acknowledge that "courts have been more flexible in cases in which the declarant is young." *Donaldson*, 58 M.J. at 484.

question." *United States v. Roberson*, 65 M.J. 43, 47-48 (C.A.A.F. 2007) (citations and internal quotation marks omitted).

Applying this standard to the two statements at issue, specifically KF biting appellant and why she did not say "no," we find the error in admitting the statements harmless. The government's case was strong, KF testified credibly, and appellant's admissions supported KF's testimony. The defense theory, that this was a custody battle, was not supported by the evidence and the divorce decree clearly contradicted this theory. Though the statement regarding biting appellant was material, it was cumulative with KF's testimony. Further, KF's testimony was more detailed: she testified to the sound appellant made when she accidentally bit him, so the more compelling testimony came not from the hearsay statements but from the victim herself. Accordingly, we find no prejudice to appellant by the military judge's admission of KF's statement to LA.[15]

## CONCLUSION

Upon consideration of the entire record, the findings and sentence as adjudged and approved by the convening authority are AFFIRMED.

Senior Judge MULLIGAN and Judge FEBBO concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[15] In reaching this conclusion, we did not analyze whether these statements would have been admissible as prior consistent statements if offered by the government at the appropriate time.