*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

### UNITED STATES
Appellee

**v.**

### John C. RIESBECK, Boatswain's Mate Second Class
United States Coast Guard, Appellant

#### No. 17-0208
Crim. App. No. 1374

Argued October 25, 2017—January 23, 2018

Military Judge: Michael E. Tousley (trial); Gary E. Felicetti (*DuBay* hearing)

For Appellant: *Lieutenant Phillip A. Jones* (argued); *John Smith*, Esq. (on brief).

For Appellee: *Lieutenant Commander Tereza Z. Ohley* (argued); *Stephen P. McCleary*, Esq. (on brief).

Judge RYAN delivered the opinion of the Court, in which Chief Judge STUCKY, Judges OHLSON and SPARKS, and Senior Judge ERDMANN, joined.

————————

Judge RYAN delivered the opinion of the Court.

Following voir dire and challenges, the seven-member panel that convicted and sentenced Appellant was composed of five women, four of whom were victim advocates—persons trained to provide support and counseling to victims of rape and sexual assault—and two men. The military judge holding a post-trial hearing on the composition of Appellant's panel[1] concluded that:

> Given the intense external pressures [regarding sexual assault cases], and lack of any other explanation, the most likely reason [for the selections made by the various people involved in the pro-

---

[1] After remand from this Court, *United States v. Riesbeck*, 74 M.J. 176 (C.A.A.F. 2014) (summary disposition), a hearing was ordered in accordance with *United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411 (1967). *United States v. Riesbeck*, Dkt. No. 1374, Order for a *DuBay* Hr'g (C.G. Ct. Crim. App. Jan. 20, 2015).

cess] is conscious or unconscious decisions . . . that it was very important to have a large number of women on the court."

As detailed more fully below, the member selection process in this case utilized gender as an important selection criterion. There is nothing in Article 25, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 825(d)(2) (2012),[2] that permits selecting members to maximize the presence of a particular gender (or any other non-Article 25, UCMJ, criteria) serving on a court-martial.[3] *See* Article 25, UCMJ; *United States v. Smith*, 27 M.J. 242, 250 (C.M.A. 1988) (rejecting intentional selection of women panel members in sex offense case with a female victim and male defendant); *cf. United States v. McClain*, 22 M.J. 124, 131 (C.M.A. 1986).

Moreover, this case is readily distinguishable from both the dicta in *Smith*, 27 M.J. at 249 (suggesting that race and gender may be taken into account to create a panel more representative of the accused's race or gender), and *United States v. Lewis*, 46 M.J. 338, 342 (C.A.A.F. 1997) (holding that court stacking is not raised by a statistically anomalous number of women alone). Any suggestion that the selections in this case were made to promote inclusiveness, ensure a representative panel, or for an otherwise benign purpose is specious. *See United States v. Riesbeck*, Dkt. No. 1374, 2016 CCA LEXIS 744, at *6–7 (C.G. Ct. Crim. App. Nov. 30,

---

[2] Article 25(d)(2), UCMJ, states when convening a court-martial, the convening authority "shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experiences, length of service, and judicial temperament."

[3] This Court granted Appellant's petition on the following issues:

> I. Whether members of Appellant's court-martial were properly selected.
>
> II. Whether Appellant was deprived of a fair trial, or the appearance of a fair trial, where a majority of the panel members were former victim advocates and the military judge denied a challenge for cause against one of them.

This Court need not reach Issue II in light of the resolution of Issue I.

2016).

Where selection of members on an impermissible basis is raised by the evidence, the government needs to present affirmative evidence of benign intent beyond a reasonable doubt, *United States v. Upshaw*, 49 M.J. 111, 113 (C.A.A.F. 1998) (citing *Lewis*, 46 M.J. at 340−41; *Smith*, 27 M.J. at 249). If not, the ready inference and legal consequence is that the improper selection was made to affect the result, a form of unlawful command influence. Article 37, UCMJ, 10 U.S.C. § 837 (2012); *United States v. Hilow*, 32 M.J. 439, 441−42 (C.M.A. 1991). In this case, the Government presented no evidence of benign intent at the *DuBay* hearing, and we hold that those involved in the selection process believed court stacking based on gender would influence the result of Appellant's court-martial. Further, the Government has not established that the error was harmless beyond a reasonable doubt. *United States v. Bartlett*, 66 M.J. 426, 430 (C.A.A.F. 2008). The decision of the United States Coast Guard Court of Criminal Appeals (CGCCA) is reversed.

## I. Facts and Procedural History

The underlying facts leading to the charges in this sexual assault case are not directly relevant to the issues before us.[4] We focus instead on the panel selected and the events surrounding the selection of members to sit on Appellant's court-martial panel.

## A. Initial Procedural History

Appellant chose to be tried by a panel including enlisted members. Ten members were ultimately detailed to sit as Appellant's court-martial panel. Seven of these members were women. Thus, although the court-martial panel for this case was selected from a roster of officers that was only twenty percent female and a pool of enlisted personnel that was only thirteen percent female, the panel selected for Ap-

---

[4] A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of making a false official statement, one specification of rape by force, and one specification of communicating indecent language in violation of Articles 107, 120, and 134, UCMJ, 10 U.S.C. §§ 907, 920, 934 (2012).

pellant's court-martial was seventy percent female. Five of the women were victim advocates. Following voir dire and Appellant's challenges, the panel consisted of seven members, five of whom were women. Four of those women were victim advocates.[5] Subsequently, having obtained the convening authority's member-selection materials, Appellant argued, based on those materials, that there was no "conceivable, rational or logical reason" for seven of ten members to be women, five of whom were victim advocates, and moved to strike the female members as improperly selected on the basis of gender. The military judge denied the motion as untimely while blithely asserting the issues could be worked out on appeal rather than actually investigating the allegation.[6] Appellant was convicted and sentenced to three months of confinement, a reduction to E-2, and a bad-conduct discharge.

On his initial appeal to the CGCCA, Appellant asserted, inter alia, that he was deprived of his right to a fair trial by an impartial panel as a result of improper member selection. *United States v. Riesbeck*, Dkt. No. 1374, 2014 CCA LEXIS 946, at *2 (C.G. Ct. Crim. App. Aug. 5, 2014) (unpublished). Though he had raised the issue at trial, the CGCCA held that Appellant waived his objection to improper member selection and affirmed the findings and sentence. *Id.* at *10–11, *18.

This Court concluded that the objection to member selec-

---

[5] The military judge denied the challenge for cause against LCDR KO, another one of the women, who had experience counseling a victim of sexual assault. Appellant exercised his peremptory challenge against her.

[6] The fact that this case with these facts is returned to us for a second time, rather than attended to at trial, at the *DuBay* hearing, or by the CGCCA, is a stain on the military justice system. The duty to protect servicemembers against unlawful command influence is not ours alone: "Military judges must continue to fulfill their essential role as the 'sentinel' of the military justice system in identifying and addressing instances of unlawful command influence. Moreover, judges on the service Courts of Criminal Appeals must also appropriately address unlawful command influence whenever they encounter it in specific cases." *United States v. Boyce*, 76 M.J. 242, 253 n.9 (C.A.A.F. 2017) (citations omitted).

tion was not waived, relying on Rule for Courts-Martial (R.C.M.) 912(b)(3), which provides an exception to the requirement that a timely motion be made where an objection is based on an allegation that the convening authority selected members for reasons other than those listed in Article 25, UCMJ. *Riesbeck,* 74 M.J. at 176; *see also* R.C.M. 502(a)(1). We also noted that improper member selection can constitute unlawful command influence, which cannot be waived. *Riesbeck,* 74 M.J. at 176; *United States v. Baldwin*, 54 M.J. 308, 310 n.2 (C.A.A.F. 2001). We vacated the CGCCA decision, granted the issue: "Was Appellant deprived of a fair trial by an impartial panel?," and remanded the case for further proceedings. *Riesbeck*, 74 M.J. at 176.

On remand, the CGCCA ordered a post-trial hearing in accordance with *DuBay*, 17 C.M.A. 411, 37 C.M.R. 411, to receive testimony and evidence regarding the composition of Appellant's court-martial panel. *United States v. Riesbeck*, Dkt. No. 1374, Order for a *DuBay* Hr'g (C. G. Ct. Crim. App. Jan. 20, 2015).

## B. Findings of the *DuBay* Military Judge

The detailed factual background and intricacies behind the member selection process in this case (among other things) are set forth in detail in Appendix A (*DuBay* Hearing: Final Findings of Fact) and discussed at some length in the CGCCA's opinion. *Riesbeck,* 2016 CCA LEXIS 744, at *3, *8–13. Rather than marching through extraneous details, we focus on the discrete findings salient to the decisional issues in this case, all of which are supported by the record.

At the time of Appellant's court-martial, "senior Coast Guard and Department of Defense leadership faced intense external pressure to do more about preventing and responding to sexual assaults." Coast Guard "policies and initiatives" emerged as a result of this external pressure, including "a combat-like campaign in the 'righteous' cause of fighting sexual assault." "Selection of the court members in this case occurred within this overall environment."

The process of selecting the members for Appellant's court-martial included four different individuals: VADM Brown, RADM Colvin, RADM Ryan, and ADM Zukunft. The digests provided to the first three included the Article 25,

UCMJ, criteria along with rosters which listed, among other information, the full names and gender of each servicemember eligible to be placed on the panel.[7] They were advised to select individuals using the roster *and* the Article 25, UCMJ, criteria. Roster information, "such as gender, that did not explicitly align with Article 25 was, at least, given co-equal status with Article 25."

VADM Brown, the Coast Guard Pacific Area & Defense Forces West (PACAREA) commander, was "aware that the bulk of pending cases involved sexual assaults and consciously or unconsciously desired to have a significant number of women on the panel." VADM Brown chose ten officers, six of whom were women, for the convening order in this case. Women made up twenty percent of the roster of eligible officers used by VADM Brown. No identified selection criteria distinguished the chosen women. His "general practice of seeking a range of ranks on a court-martial panel should not have resulted in a court composed of 60% women." All ten names selected appeared on the initial convening order.

After Appellant requested enlisted representation, the then acting convening authority,[8] RADM Colvin, selected ten enlisted members for the panel—four of these members were women.[9] He knew one of the female selectees fairly well. The most obvious explanation for why he "selected three additional women is some desire to have a significant number of women on the panel—perhaps while thinking of obtaining a good mix." RADM Colvin's past practice "had been to seek a 'mix of educational backgrounds' while paying

---

[7] PACAREA used a multi-step process "not apparent from the Digest." (Emphasis omitted.) The convening authority selects members from the roster, in accordance with a digest provided by the SJA, and rank orders them. The legal staff then contacts selected members to determine availability. If unavailable, the name is removed from the draft convening order and the next highest ranked person goes on the draft convening order. The draft order then goes to the convening authority for final approval.

[8] The question of whether RADM Colvin had the authority to act as the convening authority is not before us.

[9] The roster of eligible enlisted used by RADM Colvin was only thirteen percent female.

particular attention to length of service." However, no criteria other than gender distinguished the chosen women.

Several of the members selected by RADM Colvin were subsequently deemed unavailable, and the SJA requested that RADM Ryan select an additional eight enlisted members for Appellant's court-martial panel. Despite drawing from the same roster as RADM Colvin, which was thirteen percent female, three of the eight members selected by RADM Ryan were women. RADM Ryan then intentionally rank-ordered the three women selected as her first, second, and fourth choices out of the eight enlisted members although she "did not know any of the enlisted members selected." The "most obvious explanation for this amendment to the court being 37.5% female is some desire, either conscious or unconscious, to have a significant number of women on the panel."

ADM Zukunft took command of PACAREA and the SJA presented ADM Zukunft with various amendments to the convening order which essentially ratified the selections of RADM Ryan and VADM Brown, after accounting for personnel deemed unavailable. At the end of this complex selection process, the enlisted portion of the panel detailed to Appellant's court-martial was seventy-five percent female and the officer portion was sixty-seven percent female.

The digest provided to ADM Zukunft did not contain gender information, so it is unlikely that ADM Zukunft himself was aware of the gender composition of the panel. Nor did the digest contain a description of the Article 25, UCMJ, selection criteria. Moreover, ADM Zukunft's stipulated testimony revealed that he was not aware of the requirements of Article 25, UCMJ, and believed that member selection was not a best qualified process, but did look for diversity when selecting members.

The SJA was "aware of the high percentage of females on the panel but ha[d] no discussions with any of the [convening authorities] about it." While the *DuBay* military judge determined that there was no coordinated action between VADM Brown, RADM Colvin, RADM Ryan, and ADM Zukunft to maximize the number of women selected, he also found that it was "no coincidence that every relevant deci-

sion [made] by [VADM Brown, RADM Colvin, and RADM Ryan] resulted in an unusually large number of females being selected [to sit on the panel] and/or being highly ranked for future selection."

Based on the foregoing information, the *DuBay* military judge concluded that "[g]iven the intense external pressures, and lack of any other explanation, the most likely reason for the selections made by [VADM Brown, RADM Colvin, and RADM Ryan] were conscious or unconscious decisions . . . that it was very important to have a large number of women on the court." At each phase of member selection, the parties could not identify any other subgroup that was over represented to the extent of women. The military judge also found at each step that no selection criteria had been identified which could explain the selection of so many women, or "distinguish[]" the members selected on any basis other than gender.

The *DuBay* military judge's ultimate conclusion was that ADM Zukunft himself did not make any gender-based decisions, but rather implemented previous decisions by others: "Absent personal knowledge of the listed members, which he does not appear to have, [he] could not have 'packed' the court with women even if he desired to do so."

### C.  The Second Appeal

Following the *DuBay* hearing, Appellant raised several assignments of error at the CGCCA. *Riesbeck*, 2016 CCA LEXIS 744. Appellant asserted, inter alia, that the convening authority disregarded the member selection factors present in Article 25(d)(2), UCMJ, and selected a panel with a disproportionate number of women. *Id.* at *3.

The CGCCA again affirmed the findings and the sentence. *Id.* at *24. As relevant to the granted issue, the CGCCA concluded that there was no evidence that the convening authorities or their subordinates were "motivated by the intent to achieve a particular result as to findings or sentence." *Id.* at *10. In addition, the CGCCA, relying on *Lewis*, 46 M.J. 338, held that Appellant failed to raise sufficient evidence of court stacking because "court stacking is not raised by an anomalous number of women on a single court-martial panel, in the absence of evidence of a pattern

8

or of improper motive or other impropriety." *Id.* at \*14. In addition, the CGCCA concluded that detailing members based on gender fosters "inclusiveness of 'all segments of the military community'" and is benign. *Id.* at \*14−15 (quoting *United States v. Dowty*, 60 M.J. 163, 171 (C.A.A.F. 2004)).

## II. Discussion

We disagree with the legal conclusions of both the CGCCA and the *DuBay* hearing military judge. As a threshold matter, gender is not an Article 25, UCMJ, factor, and selection on the basis of gender is *generally* prohibited. *United States v. Gooch*, 69 M.J. 353, 358 (C.A.A.F. 2011) (citing *Dowty*, 60 M.J. at 170–71); *Lewis*, 46 M.J. at 341; *United States v. Witham*, 44 M.J. 664, 666 (N-M. Crim. Ct. App. 1996) (citing *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994)). To the extent there is an exception to provide for a good faith effort to ensure a "representative" or "inclusive" panel, *Smith*, 27 M.J. at 249, the *DuBay* military judge found no such "benign" motive, and it is clear from his findings of fact that it is pure sophistry to pretend that such a motive exists in this case.

As we stated long ago, even reasonable doubt concerning the use of improper panel selection criteria will not be tolerated in the military justice system. *United States v. Greene,* 20 C.M.A. 232, 238–39, 43 C.M.R. 72, 78−79 (1970). Based on the facts as found at the *DuBay* hearing, Appellant has raised the issue of improper member selection on the basis of gender. The Government has failed to prove at all, let alone beyond a reasonable doubt, that the improper member selection process was not motivated by gender-based court stacking. Additionally, the Government has not met its burden of convincing this Court beyond a reasonable doubt that Appellant received a fair trial from an impartial panel, free from the effects of unlawful command influence. *United States v. Lewis*, 63 M.J. 405, 414−15 (C.A.A.F. 2006).

## A. Member Selection and Article 25, UCMJ

This Court reviews the selection of court-martial members for error de novo. *Bartlett*, 66 M.J. at 427 (citations omitted). Based on the military judge's findings of fact from the *DuBay* hearing, which, as the CGCCA noted, *Riesbeck*, 2016 CCA LEXIS 744, at \*24, are supported by the record,

we are convinced that the member selection in this case was based in no small part on gender, which is error. *Dowty*, 60 M.J. at 171; *Lewis*, 46 M.J. at 341.

Courts-martial are not subject to the jury trial requirements of the Sixth Amendment, and, therefore, military members are not afforded a trial in front of a representative cross section of the military community. *McClain*, 22 M.J. at 128. Indeed, in the military justice system, the commanding officer refers the charges to a court-martial that he or she has convened, by selecting members and detailing them to it. Articles 22 and 23, UCMJ, 10 U.S.C. §§ 822, 823 (2012); R.C.M. 501−503. "Under these circumstances, it is incumbent upon this Court to scrutinize carefully any deviations from the protections designed to provide an accused servicemember with a properly constituted panel." *Upshaw*, 49 M.J. at 116 (Effron, J., dissenting). In part, it is for this reason that that even reasonable doubt concerning the use of impermissible selection criteria for members cannot be tolerated. *United States v. Bertie*, 50 M.J. 489, 493 (C.A.A.F. 1999) (*citing Greene*, 20 C.M.A. at 238, 43 C.M.R. at 78).

A military defendant has a right both to "members who are fair and impartial." *United States v. Kirkland*, 53 M.J. 22, 24 (C.A.A.F. 2000) (internal quotation marks omitted) (quoting *United States v. Roland*, 50 M.J. 66, 68 (C.A.A.F. 1999)), and the appearance of an impartial panel, *United States v. Ward*, 74 M.J. 225, 228−29 (C.A.A.F. 2015). In large measure, Article 25, UCMJ, seeks to effectuate that end, *McClain*, 22 M.J. at 128−29, and represents Congress's criteria for panel members sitting on a court-martial. A convening authority has significant discretion when selecting panel members based on the factors outlined in Article 25(d)(2), UCMJ. *United States v. Smith*, 37 M.J. 773, 776 (A.C.M.R. 1993) (citing *United States v. Crawford*, 15 C.M.A. 31, 35 C.M.R. 3 (1964)). However, this discretion "is not unfettered, particularly when the convening authority reaches *beyond* the statutory criteria in making his selection." *Id.* (emphasis added). That is what happened in this case.

Neither race nor gender is included among Article 25, UCMJ, factors, and, to be sure, there are minefields of constitutional proportion aplenty lurking to upset selections based on gender (or race). *Cf. J.E.B.*, 511 U.S. at 130−31

10

(Equal Protection Clause prohibits the use of peremptory challenge against jury member based on gender); *Batson v. Kentucky*, 476 U.S. 79, 85−86 (1986) (Equal Protection Clause prohibits the use of peremptory challenge against jury member based on race); *Lewis*, 46 M.J. at 341. Because the military justice system works differently, and members are selected by the convening authority, we have permitted a convening authority to depart from the factors present in Article 25, UCMJ, in one limited circumstance: when seeking in good faith to make the panel more representative of the accused's race or gender. Thus, in *Crawford*, the convening authority had intentionally selected a black servicemember to serve as a court member where the accused was black, reasoning that "[i]f deliberately to include qualified persons is discrimination, it is discrimination in favor of, not against, an accused." 15 C.M.A. at 41, 35 C.M.R. at 13.

As we noted decades later, if an accused was black and a "convening authority had intentionally selected black officers as members of the court-martial panel, *Crawford's* holding would apply." *Smith*, 27 M.J. at 249. "Moreover, if appellant were a female whose case has been referred for trial and the convening authority had appointed female members, the rationale of *Crawford* would apply." *Id.* It is in this context that we concluded that Article 25, UCMJ, does not preclude a commander from taking gender into account if he or she "[was] seeking in good faith to assure that the court-martial panel is representative of the military population." *Smith,* 27 M.J. at 249 (citing *Crawford*, 15 C.M.A. 40–41, 35 C.M.R. at 12−13).

Against this backdrop, the absurdity of the suggestion that the panel composition in this case was an appropriate attempt at "inclusiveness," or "representativeness" is readily apparent. First, Appellant is neither a woman nor a victim advocate. Rather, he is a male, accused of rape. Second, as a matter of common sense, seventy percent is not statistically or otherwise "representative," of a population comprising less than twenty percent of the total pool of potential panel members. Third, the findings of the military judge make clear that the severe discrepancy between the percentage of available female panel members and the final makeup of

Appellant's panel was not reflective of a good-faith attempt to either comply with the dictates of Article 25, UCMJ, or create a more *representative* or an *inclusive* panel. Rather, it was riddled with intentional efforts to maximize the number of women on the panel because VADM Brown, RADM Colvin, and RADM Ryan thought it was "very important" to have a "large number of women" on the panel in this sexual assault case.

We thus reject the CGCCA's suggestion that the issue of improper member selection in this case was supported by a statistical anomaly alone. *Riesbeck*, 2016 CCA LEXIS 744, at *14−15. It is true that bare statistical evidence showing over selection of a particular group, without other supporting facts, is generally not sufficient to raise the issue of court stacking. *United States v. White*, 48 M.J. 251, 255 (C.A.A.F. 1998). But this case presents facts far in excess of a statistical anomaly, and the CGCCA erroneously applied *Lewis* to find that Appellant failed to raise the issue of improper selection criteria. *Riesbeck*, 2016 CCA LEXIS 744, at *14−15.

This case is readily distinguishable from *Lewis*. In *Lewis*, we held that the appellant failed to raise the issue of court stacking where the convening authority selected five men and four women to appellant's court-martial panel. 46 M.J. at 341–42. "[N]o one could explain why so many women were detailed to appellant's [court-martial]," *Id.* at 342, but the appellant in *Lewis* was unable to even show that the government intentionally selected women to serve on the panels. *Id.* In other words, in *Lewis*, there was no evidence that an improper selection criteria was used to create the anomalous panel, rather, the evidence was that all efforts were to comply with Article 25, UCMJ. In stark contrast, the record in this case is replete with evidence that the inclusion of a high percentage of women was the result of intentional choices by the first three convening authorities, and the apparently untutored acquiescence of the fourth.[10] It is the ev-

---

[10] We summarily jettison the red herring upon which the *DuBay* military judge appeared to rest his final conclusion, that ADM Zukunft was ignorant of the gender composition of the final convening order so that he could not engage in court stacking. As our cases on court stacking make clear, the actual ignorance of the convening authority does not insulate him or her from the errors

idence that an improper selection criterion was actually used that raises the court stacking issue.

Here, the *DuBay* military judge found that at each phase of panel selection, despite "no coordinated action," VADM Brown, RADM Colvin, and RADM Ryan "conscious[ly] or unconscious[ly]" decided to select a disproportionate number of women to serve on Appellant's panel. The *DuBay* military judge found that no other discernible group was over represented to this extent and no other selection criteria were identified that could explain the selection. This factual determination is not clearly erroneous, and distinguishes the case at bar from *Lewis*.

Despite no "coordinated action" between VADM Brown, RADM Colvin, and RADM Ryan, the findings of the *DuBay* military judge make clear that: (1) VADM Brown, RADM Colvin, and RADM Ryan all acted in an atmosphere of external pressure regarding sexual assault cases; (2) all considered gender as a factor when selecting members for Appellant's court-martial panel; (3) all selected groups which significantly overrepresented women; (4) that the most likely explanation for their selections were "decisions" that it was "very important to have a *large* number of women on the court" (emphasis added); (5) that no other Article 25, UCMJ, criteria distinguished the women selected; (6) that at least two of the individuals with input into the process deviated from their ordinary criteria in making the selections for this case; (7) that with the exception of one woman and one convening authority, those who selected women for consid-

---

or misconduct of his or her subordinates, which are errors affecting the court-martial selection process and court stacking nonetheless. *Lewis*, 46 M.J. at 341 ("[D]eliberate stacking of the pool of potential court members by a subordinate for the convening authority is a form of unlawful command influence." (citing *Hilow,* 32 M.J. at 440)); *see also Upshaw*, 49 M.J. at 113 ("Court stacking may occur if a subordinate stacks the list of nominees presented to the convening authority." (citing *Hilow,* 32 M.J. at 440)). As such, ADM Zukunft's ignorance of the number of women present on the panel does not purge the error from the panel selection process, particularly where he was neither aware that the recommendations given to him were not based on Article 25, UCMJ, nor independently cognizant of what Article 25, UCMJ, required.

eration for the panel did not know the women selected. Moreover, unlike other cases, the *DuBay* hearing did not include any findings that any of the individuals involved made their selections based on Article 25, UCMJ, criteria, but rather that the final convening authority didn't even know the Article 25, UCMJ, criteria.

These findings are not clearly erroneous, and directly conflict with the notion that women were selected for Appellant's court-martial panel either inadvertently or to ensure that Appellant received a representative panel. *Crawford*, 15 C.M.A. 40–41, 35 C.M.R. at 12−13. In sum, a selection process geared to ensure a "large number" of women were placed on the panel in this case does not fall into the limited "representativeness" exception to Article 25, UCMJ, created by *Crawford* and *Smith,* constitutes improper member selection, and was error. We emphasize that our conclusion does not rest on bare statistical evidence of the overrepresentation of women on the court-martial panel, *cf. White*, 48 M.J. at 255, but rather on the improper purpose behind the member selection.

## B. Court Stacking and Unlawful Command Influence

While the government is absolutely prohibited from assigning members to—or excluding members from—a court-martial panel in order to "achieve a particular result as to findings or sentence" (court stacking), *Lewis*, 46 M.J. at 341 (internal quotation marks omitted) (quoting *Smith*, 27 M.J. at 250), not all improper member selection constitutes court stacking. This Court applies a case-specific analysis when deciding issues of improper member selection. *Bartlett*, 66 M.J. at 430 (citing *Hilow*, 32 M.J. at 440−42; *McClain*, 22 M.J. at 132). But even reasonable doubt concerning the use of improper panel selection criteria will not be tolerated in the military justice system. *Greene*, 20 C.M.A. at 238, 43 C.M.R. at 78. Where improper selection criteria have been used to select members for a court-martial panel, "[s]uch doubt must be resolved in favor of the accused." *Id*. at 238, 43 C.M.R. at 78 (citation omitted).

Court stacking is "a form of unlawful command influence," and has the improper motive of seeking to affect the findings or sentence by including or excluding classes of in-

14

dividuals on bases other than those prescribed by statute. *Upshaw*, 49 M.J. at 113 (internal quotation marks omitted) (quoting *Lewis*, 46 M.J. at 341). Once the issue of improper member selection has been raised, as it has been in this case, the burden shifts to the government to demonstrate beyond a reasonable doubt that improper selection methods were not used, or, that the motive behind the use of the selection criteria was benign. *Id*; *Roland*, 50 M.J. at 69; *McClain*, 22 M.J. at 132; *Greene*, 20 C.M.A. at 239, 43 C.M.R. at 79. The government can rebut a claim of court stacking by showing administrative error, *Upshaw*, 49 M.J. at 112−13 (court-stacking not raised where government showed and defense conceded that exclusion of technical sergeants from the panel was a mistake in the absence of evidence to the contrary), or by showing that, in fact, the convening authority included or excluded a certain group from panel membership in an attempt to comply with Article 25, UCMJ. *United States v. Nixon*, 33 M.J. 433, 434−35 (C.M.A. 1991) (holding that explicit testimony regarding compliance with Article 25, UCMJ, criteria and determination of CCA that the convening authority did comply overrode appearance of a stacked panel).

The government cannot always meet that high burden. *McClain*, 22 M.J. at 132; *Greene*, 20 C.M.A. at 239, 43 C.M.R. at 79. Sometimes the facts clearly establish an improper motive based on testimony that the purpose of the improper selection was to create a panel more disposed to "adjudge heavier sentences," *McClain*, 22 M.J. 130−31, or to select members with the unique "experience" required to understand the testimony of the victim, *Smith*, 27 M.J. at 249−50. Those easy cases are clear instances of court stacking.

Other times, as in this case, there is no outright admission, but the government has not, and likely cannot, establish a benign purpose for the improper selection criteria. The *DuBay* hearing findings of fact contains not a single explanation, let alone a "benign" explanation, for the intentional selection of so many women in this sex offense case, other than that the various convening authorities believed it was "very important" to place a large number of women on the panel. The Government has failed to show beyond a reason-

able doubt that there was a benign explanation to rebut the allegation of improper member selection.

Contrary to the CGCCA's view, the absence of direct evidence in the form of testimony of malintent and impure motive does not mean that there is no evidence that the convening authorities or their subordinates were motivated by the intent to "achieve a particular result as to findings or sentence." *Id.* at 250 (internal quotation marks omitted) (quoting *McClain*, 22 M.J. at 132). Rather, as in other instances of asserted unlawful command influence, where the government fails to meet its burden to rebut the allegation, as a matter of law Appellant has, therefore, established unlawful command influence—in this case, that the purpose for the improper selection criteria was the unlawful one of seeking to affect the findings or sentence. *United States v. Gerlich*, 45 M.J. 309, 310 (C.A.A.F. 1996); *cf. United States v. Biagase*, 50 M.J. 143, 150–52 (C.A.A.F. 1999).

And here that legal consequence and inference is fully supported by the record. The salient facts paint a clear picture of court stacking based on gender in an atmosphere of external pressure to achieve specific results in sexual assault cases. Against that backdrop, purposefully selecting a panel that is seventy percent female, most of whom are victim advocates, from a roster of officers that was only twenty percent female and a pool of enlisted that was only thirteen percent female, smacks of a panel that was "hand-picked" by or for the Government. *United States v. Hedges*, 11 C.M.A. 642, 642, 29 C.M.R. 458, 459 (1960); *Cf. Dowty*, 60 M.J. at 171 ("[A] desire for representativeness cannot be a subterfuge to pack the panel." (citation omitted)). While we are loath to subscribe to the notion that women are more inclined to reach a finding of guilty in a rape case than men,[11] the facts of this case raise the specter that those tasked with choosing Appellant's court-martial panel hoped to select members predisposed to "understand the testimony" of sex-

---

[11] Although there is nothing wrong with placing either women or victim advocates on panels deciding cases involving sexual assault, when the majority of panel members in a sexual assault case are both, it gives the panel the distinct appearance of being "hand-picked" by and for the government.

ual assault victims, *Smith*, 27 M.J. at 250, in accordance with this misguided view.

## C. Prejudice

In *Bartlett*, we established three broad categories of review to guide appellate analysis of prejudice in cases involving the misapplication of Article 25(d), UCMJ. 66 M.J. at 430. When the error derives from court stacking and unlawful command influence, as it does in this case, this Court has placed the burden on the Government to prove that the error was harmless beyond a reasonable doubt. *Id.* (citing *Hilow*, 32 M.J. at 442; *McClain*, 22 M.J. at 132).

Unlawful command influence is "the mortal enemy of military justice." *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986). "No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial. . . ." Article 37(a), UCMJ. We are particularly unforgiving in the context of court member selection, as where manipulation of the member selection process is "fostered or perpetuated by military authorities through ignorance or deceit, it substantially undermines the public's confidence in the integrity of the court-martial proceedings." *Hilow*, 32 M.J. at 443 (citations omitted).

In order to prevail on the issue of prejudice, the Government must convince this Court, beyond a reasonable doubt, that Appellant received a fair trial, free from the effects of unlawful command influence. *Lewis*, 63 M.J. at 414−15. In the improper member selection context, any "doubt must be resolved in favor of the accused." *Greene*, 20 C.M.A. at 238, 43 C.M.R. at 78; *cf. Hilow*, 32 M.J. at 432−43 (finding a lack of prejudice where appellant ultimately pleaded guilty). In this case, the Government has not met the burden to show, beyond a reasonable doubt, that Appellant received a fair trial from an impartial panel. *Lewis*, 63 M.J. at 413; *Ward*, 74 M.J. at 229 (citing *Kirkland*, 53 M.J. at 25).

The very panel that tried, convicted, and sentenced Appellant was the same panel "hand-picked" by those charged with selecting Appellant's court-martial panel. *Cf. Hilow*, 32 M.J. at 443. The Government's case was weak, primarily based on the testimony of SN S, the putative victim, who was unable to remember many of the events surrounding

the crime due to alcohol use and whose testimony was controverted by other witnesses at trial. The Government's case was so weak, in fact, that the Article 32 Investigating Officer recommended the dismissal of the Article 120, UCMJ, charges against Appellant. In addition, the military judge failed to conduct even a rudimentary investigation into Appellant's claims of improper member selection, completely abdicating his responsibility to cleanse Appellant's court-martial of the unlawful command influence. *United States v. Rivers*, 49 M.J. 434, 443 (C.A.A.F. 1998) ("[t]he military judge is the last sentinel protecting an accused from unlawful command influence"); *United States v. Gore*, 60 M.J. 178, 187−88 (C.A.A.F. 2004). And the CCA, rather than correct the obvious error, did not embrace its proper and frankly necessary role in the context of member selection and unlawful command influence, but rather rationalized the error away as a benign effort to seek inclusiveness.

The Government, set on arguing that there was no error, hasn't even claimed to meet its burden to show the error was harmless. Yet the error in this case is both so obvious and so egregious that it adversely affected not only Appellant's right to a fair trial by an impartial panel, but also the essential fairness and integrity of the military justice system. Article 25, UCMJ; Article 37, UCMJ; *see McClain*, 22 M.J. at 132. We thus decline to authorize a rehearing, and order that the charges and specifications be dismissed with prejudice. Article 67(d), UCMJ, 10 U.S.C. § 867(d) (2012); *Lewis*, 63 M.J. at 416. Due to the patent and intolerable efforts to manipulate the member selection process, contra every requirement of the law, Article 37, UCMJ; *Smith*, 27 M.J. at 250−51; *McClain*, 22 M.J. at 132, the failures of the military judge, the *DuBay* military judge, and the CGCCA, to investigate, recognize, or ameliorate the clear court stacking in this case, and the actual prejudice to the Appellant of being tried by a panel cherry-picked for the Government, dismissal with prejudice is the only remedy that can "eradicate the unlawful command influence and ensure the public perception of fairness in the military justice system." *Lewis*, 63 M.J. at 416.

### III. Decision

The decision of the United States Coast Guard Court of

Criminal Appeals is reversed. The charges and specifications are dismissed with prejudice. The record of trial is returned to the Judge Advocate General of the Coast Guard.

# GENERAL COURT-MARTIAL
# UNITED STATES COAST GUARD

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>BM2 John C. Riesbeck<br><br>U.S. Coast Guard | DuBay Hearing:<br><br>FINAL FINDINGS OF FACT |

This document reflects the final findings on the two limited issues of interest to the CGCCA and replaces all earlier/preliminary findings on these topics:

(1) Was appellant deprived of an impartial panel at his court-martial? More specifically, "why were there so many women on the panel?"[1]

(2) Other matters "germane" to resolving this issue.[2]

## FINDINGS OF FACT

*Court-Martial Panel Selection*

It is indisputable that in and around 2012, senior Coast Guard and DoD leadership faced intense external pressure to do more about preventing and responding to sexual assaults.[3] For example, The National Defense Authorization Act for Fiscal Year 2012, signed on 31 December 2011, made significant changes to the applicable portions of the UCMJ and required various reports and studies.[4] The external pressure continued throughout 2012[5] and included growing congressional efforts to remove some UCMJ authority from military commanders.[6]

A number of new, or revised, Coast Guard policies and initiatives resulted, including: COMDTINST M1754.10D, Sexual Assault Prevention and Response (SAPR) Program (effective on 19 APR 2012), The SAPR Strategic Plan for FY2013-2017, various ALCOAST messages, training programs, and a combat-like campaign in the "righteous"

---

[1] Women were significantly over represented on the panel from a statistical perspective. In 2012, women constituted 14.3% of the active duty workforce. Coast Guard "Snapshot 2012" document. The pool of potential officer members for this case was approximately 20% female: the enlisted pool was around 13% female.

[2] Relevant and appropriate is one common definition of germane. The defense has raised unlawful command influence on the convening authority for this narrowly focused court. This appears relevant and appropriate since UCI may arise at any point, has not yet (obviously) been considered by the appellate courts, and is never waived. Moreover, collecting the facts at this time would be efficient.

[3] A multitude of public documents, web sites, Congressional testimony, official videos, official reports, and other sources clearly establish this. E.g., *Sexual Violence and the Military*, NYT, March 9, 2012, A30.

[4] The UCMJ changes were not effective until 28 June 2012.

[5] *See*, e.g., National Defense Authorization Act for Fiscal Year 2013

[6] *See*, e.g., Written Testimony of Admiral Robert J. Papp, Jr, Commandant, U.S. Coast Guard before the Senate Armed Services Committee, June 4, 2013.

cause of fighting sexual assault.[7] Most, if not all, of these materials are available on various Coast Guard web sites.[8]

Selection of the court members in this case occurred within this overall environment. It began in late February or early March 2012. The legal office sought rosters of San Francisco Bay area personnel from a centralized database at the Coast Guard PPC. While the data fields were fixed within the database, the legal office could specify, to some extent, which data fields appeared on the printed rosters dated 5 March 2012.[9] Working within these limits, the legal office had, at perhaps some more distant point, attempted to mirror the Article 25, UCMJ criteria.

The resulting roster of officers was provided to CA #1, VADM Brown, as part of a "standard package," on or about 6 March 2012.[10] He was advised to select ten officers to serve on a new standing court-martial (CMCO #1-12)[11] "using the roster and the following criteria – age, education, training, experience, length of service, and judicial temperament." He was not specifically advised to select those "best qualified" based on these articulated criteria, which reflected Article 25, UCMJ. However, the phrase "best qualified" is used in the Digest's subject line. This would normally mean that the phrase applied to everything within or attached to the Digest – including any additional data fields on the personnel roster.

The personnel roster provided to CA #1 contained the following data fields: name, rank, date of rank, gender, age, education level, time in service, current unit and brief billet description. The names of individuals who had recently been selected to serve on other courts were also highlighted. The data fields on the personnel roster only partially align with the Article 25, UCMJ selection criteria.[12]

---

[7] http://allhands.coastguard.dodlive.mil/2013/08/15/military-campaign-office-takes-all-hands-on-deck-approach-to-eliminating-sexual-assaults-from-coast-guard/

[8] A very large volume is publically available while at least a few, such as some training documents, require CG network access since the web site records successful completion of the training. The assistant defense counsel is a CG officer with such access available.

[9] The evidence on the legal office's ability to specify the data fields is limited and mixed. The most likely scenario is that some data fields were automatically associated with others and, therefore, would appear on the rosters even if one had only requested an associated, or linked, data field. The legal office did not explicitly request gender, for example, yet it appeared.

[10] A court-martial convening package would often include other references including a copy of Article 25, UCMJ. However, it is unknown if any of the relevant packages in this case contained such a document.

[11] Although the Digest speaks of a new standing court, the CA was aware of the charges in this case and had formally indicated a desire to refer the charges to a GCM.

[12] For enlisted personnel, the "rank" category provides some rough information about the member's specific training. However, this panel was all officers. Some information about an officer's training can often be surmised from their rank and current duty assignment.

2

| Personnel roster information<br>(all part of selecting the "best qualified" per the Digest subject line) | Article 25 selection criteria<br>(listed in the SJA's 6 MAR digest but not identified as such) |
| --- | --- |
| Age | Age |
| Education level | Education |
|  | Training |
| Current unit & billet description | Experience |
| Time in service | Length of Service |
|  | Judicial Temperament |
| Rank/Date of rank |  |
| Gender (effectively listed twice)[13] |  |
| Selection for previous court w/i 6 months | *[14] |

Again, CA #1 was advised to select ten officers to serve *"using the roster* and the following criteria – age, education, training, experience, length of service, and judicial temperament." (Emphasis added) Thus, the roster information, such as gender, that did not explicitly align with Article 25 was, at least, given co-equal status with the Article 25 criteria. In other words, it effectively expanded upon the statutory definition of "best qualified."[15] Moreover, the limited information provided on each person's work experience, and lack of any explicit information about training, tended to give more weight to data fields such as age, education level, time in service, rank, and gender.

The Digest also asked CA #1 to rank order his 10 officer selections. This appears to be boilerplate reflecting an undocumented understanding of the normal method used to convene courts.[16] For this particular action, however, the language was superfluous.[17]

CA #1 considered all this information and decided to include 6 women on the court. Women constituted around 20% of the pool of potential officer members. The most obvious explanation for a court composed of 60% women is intentional choices based largely on gender. CA #1 was aware that the bulk of the pending cases involved sexual assaults and consciously or unconsciously desired to have a significant number of women

---

[13] For most, gender can be readily discerned from the full name. So the decision to list individuals with first and middle names (as opposed to just initials like on Officer Evaluation Reports) was the functional equivalent of listing gender.

[14] Prior selection as a court member would align with the "Experience" criteria if the person had actually served. However, the point of this notation was to avoid having the CA repeatedly select the same individuals – some of whom may not have been available due to transfer, pending retirement, etc.

[15] The Digest's subject line is: "SELECTION OF BEST QUALIFIED OFFICERS TO SERVE ... ." Thus, the CA is advised to use the roster (which includes gender) and the (Art 25 criteria) to determine who is "best qualified."

[16] The command normally used a multi-step process *not apparent from the Digest*: (1) CA selects members using rosters. Selections rank ordered by CA, indicating their placement on the list; (2) After selection, the legal staff contacts selected members to identify any conflicts. SJA determines if the conflict is sufficient to make the person "unavailable." If so, then the person's name is omitted from the draft convening order (CO) and the next lower ranked person goes on the draft CO; (3) Draft CO sent to the CA for signature.

[17] All 10 officers appeared on the CO, most likely because this was nominally a standing court.

3

on the panel. The parties have not been able to identify any other subgroup overrepresented to the extent of the women, or any other selection criteria that distinguished the chosen women. CA #1 does not recall making the specific selections in this case. He only knew one of his selectees fairly well, CWO Cates who is male. CA #1's general practice of seeking a range of ranks on a court-martial panel should not have resulted in a court composed of 60% women.

On 14 March, CA #1 delegated authority to the SJA to excuse court-martial members in accordance with RCM 505(c)(1)(B).[18]

The next milestone occurred on or about 22 May 2012 when CA #2, RADM Colvin, selected 10 enlisted members for this court.[19] Four were women, chosen from a pool consisting of around 13% enlisted women. The process was a near rerun of the 1st selection process, substituting the word "enlisted" for "officer" and attaching a roster of enlisted personnel. This roster had the same data fields as the earlier roster of officers.

CA #2 had served as a District Commander. He had not, however, previously been involved in the process of convening courts at PACAREA. He was, therefore, unlikely to have been fully aware of all aspects of the multi-step process used at PACAREA.[20] These steps were not described in the 22 May Digest from the SJA, the only guidance provided. Based on the 22 May Digest, CA #2 might have reasonably believed he had just directed the SJA to prepare an amendment to the CO adding the 10 selected enlisted members and removing the 4 deselected officers.[21]

CA #2 considered all the information available to him and decided to include 4 enlisted women on the court. Women constituted around 13% of the pool of potential enlisted members. CA #2 knew one of his selectees fairly well, OSCM Starliper who is female. The most obvious explanation for why CA #2 selected three additional women is some

---

[18] The SJA did not exercise this authority until after CA #1 had been relieved of command. The SJA believed the delegated authority from CA #1 survived until specifically revoked by the successor CA.
[19] There is limited, but credible, evidence that RADM Colvin was either *not* the acting Pacific Area Commander or *was* acting Commander but did *not* have authority to act as convening authority. The evidence arrived at the very end of this process and, while germane, does not directly address the specified issue. Neither party expressed a desire to seek another extension from CGCCA to pursue the issue. The most likely scenario is a confused situation due to: (1) the evolving role of the position occupied by RADM Colvin; (2) the new Area Commander's position on passing command and/or passing CA authority; (3) when and how clearly these positions were communicated to all subordinates; and (4) how quickly and effectively the staff adjusted pre-existing policies, habits, and checklists.
[20] *Supra* note 16.
[21] Unfortunately, CA #2 does not recall choosing the members in this case – only his past practices. According to the 22 May Digest, which also served as tasking from CA #2 back to the SJA, CA #2 had selected 10 enlisted persons "to serve on that panel" (Para 1), "who can serve on the court-martial panel for U.S. v. BM2 Riesbeck" (Para 2), "to sit on the panel" (Para 3) and "whom you select for service on the panel and rank order your selections" (Para 4). There is no mention of creating a pool of potential future members or explanation of the rank ordering requested in the 4th paragraph. Of course, CA #2 might have been able to figure out the process for himself, especially in light of the number of officer de-selections discussed in the 5th Digest paragraph.

The next Digest, to CA #3 on 6 June, describes the 22 May action by CA #2 as follows: "You previously selected ten enlisted members to serve on the General Court-Martial panel."

4

AE *13*

desire to have a significant number of women on the panel – perhaps while thinking of obtaining a good mix.[22] Unfortunately, CA #2 does not recall making the specific selections in this case. The parties have not identified any other subgroup overrepresented to the extent of the women, or any other selection criteria, such as lengths of service or education, that distinguished the chosen women.[23]

CA #2 also deselected 4 officers to be removed from the court – 2 males and 2 females. However, the Digest directed the CA's attention toward the convening order, which does not list gender and contains no first or middle names. Moreover, the SJA recommended 3 officers, including the 2 females, be excused due to PCS or leave. It is, therefore, likely that CA #2 only deselected 1 male officer (CAPT B) without any external input.

Following the unwritten process, the legal staff contacted the enlisted members selected by CA #2 to determine availability to serve on this case. By 6 June, "several" had been deemed unavailable for the Riesbeck court.

Accordingly, on 6 June, the SJA requested that CA #3, RADM Ryan, select an additional eight enlisted members "to sit on the panel." The Digest was substantially worded as before and the same enlisted roster was provided.[24] CA #3 considered this information and decided to include 3 enlisted women on the court. Women constituted around 13% of the pool of potential enlisted members. CA #3 did not know any of enlisted members selected. The most obvious explanation for this amendment to the court being 37.5% female is some desire, either conscious or unconscious, to have a significant number of women on the panel. The parties have not identified any other subgroup overrepresented to the extent of the women, or any other selection criteria that distinguished the chosen women.

CA #3 also rank ordered her female selectees higher than almost all the males. Females occupy three of the top four positions with the remaining 4 males making up the bottom of the list. This intentional decision becomes significant later.

However, it does not appear that CA #3, the newly reported PACAREA Chief of Staff, had any significant prior involvement in convening courts. She was, therefore, unlikely to have been fully aware of all aspects of the multi-step process used at PACAREA.[25] These steps were not described in the 6 June Digest from the SJA, the only guidance provided. The situation described in just the 6 June Digest is, therefore, somewhat confusing.[26] CA #3 might have reasonably believed she had just directed the SJA to prepare an amendment to the CO adding all, or most, of the 8 selected enlisted members.

This did not happen. Instead, the SJA prepared a new Digest explaining the actions of CA #1- CA #3 and the resulting canvas of selectees to determine availability for the

---

[22] *Infra* note 23.

[23] CA #2's past practice as a District Commander had been to seek a "mix of educational backgrounds" while paying particular attention to length of service.

[24] Previous enlisted selections by CA #2 were noted on the roster.

[25] *Supra* note 16.

[26] It is unclear if the "several" (of 10) enlisted members described as being "unavailable" have been excused or why selections are being ranked ordered.

535

Riesbeck court. It is mistitled as an amendment to CMCO #2-11.[27] More significantly, the 8 June Digest is worded as if only a single individual served as CA during the entire process. (E.g. "You convened" GCM 1-12; "You selected" 10 officers; "You selected" enlisted members, etc.) Accordingly, the package includes a draft amendment to the convening order "which is comprised of the remaining six (6) officers and the four (4) enlisted members *you* ranked highest in your selections." (Emphasis added)

This 8 June package, however, is received and acted on by CA #4, VADM Zukunft, who has not been involved in the process. He has not seen the centrally generated rosters or previous Digests, been advised on the Article 25 selection criteria, or made any previous decisions in this case. He has not met with the SJA about the convening order. He is new to PACAREA. VADM Zukunft had previously served as a District Commander and seemed familiar with the military justice process in 2012. However, his stipulated testimony clearly shows he does not believe that court-martial panel selection is a "best qualified" process – but he does look for "diversity."

The 8 June Digest, considered by CA #4, was significantly different from all the previous ones. It makes no mention of the Article 25 selection criteria or of choosing the "best qualified" members.[28] It does not include the large personnel rosters or any reference to them. Accordingly, the entire "pool" of personnel provided to CA #4 effectively consists of just 10 officers (already on the court) and 18 enlisted. Of these, 9 enlisted members have explicit conflicts listed and 4 officers are identified as having been previously deselected.[29] This leaves the 6 officers already on the court (selected by CA #1) and 9 rank-ordered enlisted personnel. CA #3 had selected almost all of the remaining enlisted personnel. This makes her rank-ordering decisions particularly important.

CA #4 signs the enclosed CO amendment, adopting the SJAs excusal recommendations and implementing the rank-ordering system of the previous CAs. There are no discussions with the SJA. As a result, the enlisted portion of the panel is 50% female at this point. However, none of the documents viewed by CA #4 contained gender information so it is unlikely he was fully aware of this.

On 11 June, the SJA excuses a male enlisted member of the court. He doesn't recall the reason. This action exhausts the enlisted list created by CA #2, making the rank ordering by CA #3 particularly important.

The SJA prepares an amendment to the CO adding the next highest ranked enlisted member to the court.[30] This person is female while the four other enlisted in the "pool" (not selected) are male. Time is short. CA #4 signs the draft amendment later on 11 June. The enlisted portion of the court is now 75% female. The officer portion is 67% female. The SJA is aware of the high percentage of females on the panel but has no discussions with any of the CAs about it.

---

[27] It should have said CMCO #1-12
[28] A likely contributing factor was the space limit of the "Digest" format and time pressures at this point.
[29] The 8 June Digest does not explain that 3 of the deselected officers had conflicts.
[30] As rank ordered by CA #3.

6

In fact, there have been no previous discussions about a desired gender composition of this, or any other, court. There was no coordinated action between CA #1 – CA #4 to maximize the number of female members. It is, however, no coincidence that every relevant decision by CA #1 – CA #3 resulted in an unusually large number of females being selected and/or being highly ranked for future selection. Given the intense external pressures, and lack of any other explanation, the most likely reason is conscious or unconscious decisions by CA #1 – CA #3 that it was very important to have a large number of women on the court.

On the other hand, CA #4, did not make any gender-based decisions. His actions were voluntarily ministerial in nature in that he implemented previous decisions by others.[31] Moreover, CA #4 was not provided gender-based information in the very limited packages provided to him by the SJA. Absent personal knowledge of the listed members, which he does not appear to have, CA #4 could not have "packed" the court with women even if he had desired to do so.[32]

*UCI on the CA for this hearing*

COMDTINST M1754.10D, Sexual Assault Prevention and Response (SAPR) Program, was effective on 19 APR 2012. It requires all hands to take reports of sexual assault seriously and imposes a duty to act once made aware of a potential assault. It provides a wide range of actions and policies to support victims. It also explicitly states that the "alleged offender" is innocent until proven guilty in a legal proceeding and shall be treated with respect and appropriate care and concern at all times.

The defense has located, and attached to one motion, a statement on the PACAREA web site attributed to the (then) Area Commander, VADM Zukunft on the topic of sexual assault prevention. The statement was written or approved by him in June 2012 as part of his "Commander's Intent."[33] It refers to all personnel under his command as "immediate family" and expresses intolerance of all acts of sexual assault that undermine the "well-being of my family tree." It implies, to an extent, that a service member accused of sexual assault is automatically expelled from the family.

After the Riesbeck court-martial in 2012, Coast Guard leadership continued to face intense external pressure to do more about sexual assaults despite the new/updated policies and high-visibility programs.[34] This external pressure included congressional efforts to remove some UCMJ authority from military commanders.[35] On 3 June 2013,

---

[31] CA #4 could have, obviously, returned the very limited package provided by the SJA on 8 June due to the lack of information or directed the CO amendment process to begin anew.

[32] There is credible evidence that CA #4 did not understand, and therefore could not have applied, the Article 25 selection criteria. However, CA #4 chose to simply ratify the actions of CA #2 and CA #3. *Supra* note 31 and accompanying text. Neither party expressed a desire to seek another extension from CGCCA to further develop the issue.

[33] More recently, now-ADM Zukunft issued ALCOAST 117/15 (27 MAR 2015).

[34] http://allhands.coastguard.dodlive.mil/2013/08/15/military-campaign-office-takes-all-hands-on-deck-approach-to-eliminating-sexual-assaults-from-coast-guard/

[35] *See*, Written Testimony of Admiral Robert J. Papp, Jr. Commandant, U.S. Coast Guard before the Senate Armed Services Committee, June 4, 2013.

7

the Secretary of Homeland Security personally directed the Commandant "to take whatever action is required to eradicate sexual assault from our Service and to ensure victims receive *immediate*, compassionate, and *complete* support."[36] Apparently, the existing policies were considered inadequate or incomplete – unless SEC DHS was simply ordering the COMDT to maintain the status quo.

Subsequent actions by CG officials indicate that SEC DHS did more than order the COMDT to maintain the status quo. Beginning around the time of the SEC DHS order, the message sharpened and began to separate into a second camp, of sorts. One recent summary of the sharper emphasis (after the SEC DHS order) occurred on 5 DEC 2014 in what appears to be an all-hands email from the Vice Commandant.[37]

The core of the new culture boils down to these often-repeated indoctrination points:

- Criminal sexual assault is a big problem in the Coast Guard.
- There is always a victim/survivor who shall receive unqualified support.[38]
- Investigations, and subsequent actions, will hold the perpetrators/ predators accountable.[39]
- Resolving this big problem, and holding individuals accountable, is everyone's responsibility. NOT IN OUR COAST GUARD.[40]

---

[36] Written Testimony of Admiral Robert J. Papp, Jr. Commandant, U.S. Coast Guard before the Senate Armed Services Committee, June 4, 2013 (emphasis added).

[37] Sent Friday, DEC 5 at 6:03PM. Subject: Preliminary Results on Sexual Assault from the 2014 RAND Military Workplace Survey. This email contains a hyperlink to host of related materials at "Coast Guard All Hands, The Official Blog For the Coast Guard Workforce." http://go.usa.gov/6Enm.

[38] ALCOAST 362/14 (AUG 2014) summarized earlier changes to various policies implementing the new culture. It firmly states that, within some contexts, a "victim" is anyone who files an unrestricted report of sexual assault, whether the investigation has been completed or not. This is consistent with the SEC DHS order for "immediate, compassionate, and complete support" of the "victim." As an incentive to file unrestricted reports, ALCOAST 362/14 reinforces that "victims" can reasonably anticipate a transfer to a desired location with suitable support resources for his or her "recovery."

[39] One official blog post of 3 DEC 2013 explicitly cited details from a court-martial *acquittal* when "inform[ing] its readers of the breadth and scope of sexual assault in the Coast Guard." It continues; "In [this] case, members of the jury either believed *the survivor* was in fact capable of consenting, or, that *the assailant* was reasonably mistaken as to whether she could consent." http://allhands.coastguard.dodlive.mil/2013/12/03/why-arent-you-talking-with-your-shipmates-about-sexual-assault (emphasis added). See also http://allhands.coastguard.dodlive.mil/2014/01/15/why-arent-you-talking-with-your-shipmates-about-sexual-assault-why-is-it-so-hard-to-admit-we-have-a-problem (JAN 2014)

[40] These four points clearly dominate the ongoing cultural message and indoctrination. However, important caveats were listed on 9 OCT 2013 in ALCOAST 441/13, "The Integrity of the Military Justice Process." This message reaffirms the independence of the military justice process, urges fairness and impartiality, and disclaims any Commandant interest in seeing a specific outcome in any case. Without referring to them, this message appears to reflect policy documents pre-dating the June 2013 SEC DHS order such as COMDTINST M1754.10D, Sexual Assault Prevention and Response (SAPR) Program, 19 APR 2012; SAPR Strategic Plan for FY2013-2017 (promulgation date unclear but FY 2013 began on 1 OCT 2012). Unfortunately, ALCOAST 441/13 (OCT 2013) made no reference to the larger body of official communications establishing and reinforcing the new culture. It did not modify ALCOAST 244/13 or any of the four core cultural themes. It also did not explain how individuals reconcile ALCOAST 441/13 with the mandate to always have an unquestioned sexual assault victim/survivor with the unqualified support of all hands. Moreover, for the next 17 months, official communications made no reference to ALCOAST

8

AE 113

Around the same time, however, the convening authority for this hearing credibly explained, in a separate sexual assault case, his fuller and more accurate understanding of his independent military justice responsibilities.

Moreover, ALCOAST 117/15 (27 March 2015) subsequently addressed many, if not all, of the sharpened edges of the alternate policy camp and appeared to turn the service back toward the more balanced documents such as the FY13-17 SAPR Strategic Plan, COMDTINST M1754.10D, and ALCOAST 441/13. It also, for the first time, explained the critical distinction between offering support services for a claimed "victim" and independently determining guilt under the "laws of our Nation."

On balance, it does not appear that the obvious pressure on the CA to solve the overall problem of sexual assaults in the Coast Guard is intended to influence, or has actually influenced, any specific decisions of the CA in this case.

## CONCLUSION

A purpose of this limited hearing was to, essentially, go back to when the specified issue was first raised at trial and permit the accused an opportunity to develop it in accordance with the applicable rules and procedures. This has been accomplished. In many respects, the prolonged opportunity provided was superior to that most likely available in the midst of the original trial.

**Accordingly,**

The following documents are added to the record: (1) Declaration of BM2 Riesbeck regarding stipulations of expected testimony; (2) Stipulation of expected testimony of VADM Brown (ret.); (3) Stipulation of expected testimony of RADM Colvin (ret.): (4) Stipulation of expected testimony of RDML Ryan; (5) Stipulation of expected testimony of ADM Zukunft; (6) Excel sheet "PAC Chain of Command-2012-Legal."

This DuBay hearing is adjourned.

18 June 2015

*//s//*
Gary E. Felicetti
Captain, U.S. Coast Guard
Senior Military Judge

---

441/13 and appeared to abandon the principles contained within it. This created an appearance of two distinct, conflicting, and isolated policy camps.